# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| CLINT MEADOWS, MICHAEL SHOWS, and MATT TAYLOR, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SYNGENTA CROP PROTECTION AG, SYNGENTA CORPORATION, SYNGENTA CROP PROTECTION, LLC, and CORTEVA, INC.<br><br>Defendants. | Civil Action No. 1:22-CV-01128<br><br>**COMPLAINT – CLASS ACTION** |

Plaintiffs Clint Meadows, Michael Shows, and Matt Taylor bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure against Defendants Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC, and Corteva, Inc. Defendants' exclusionary and anticompetitive behavior has caused farmers such as Plaintiffs and other similarly situated indirect purchasers to pay artificially inflated prices for crop protection products needed to protect their crops from pests. Plaintiffs bring this action on behalf of themselves and on behalf of a plaintiff class (the "Class") consisting of all persons and entities in Repealer Jurisdictions who, other than for the purpose of resale, indirectly purchased or paid for a crop protection product containing one or more of the Relevant AIs (as defined below) that was manufactured by one or more of the Defendants at any time during the period from December 27, 2018, through and until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period").

A Repealer Jurisdiction is a state or district that has repealed the bar on indirect purchaser plaintiffs recovering under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and includes the following: Arizona, California, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin. Plaintiffs bring this action against Defendants for injunctive relief under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and section 3 of the Clayton Act, 15 U.S.C. § 14, and for damages under the antitrust laws and consumer protection laws of the several states. Plaintiffs demand a trial by jury.

I.      **INTRODUCTION**

1.      This case involves an anticompetitive scheme by Defendants, two manufacturing giants in the crop protection product industry, to illegally block rivals from the market and insulate themselves from competition. Defendants have entered into exclusionary "loyalty agreements" with substantially all of their major customers that deter those customers from purchasing products from manufacturers other than Defendants. The effect of those exclusionary agreements has been to lock rival manufacturers out of the market and force farmers like Plaintiffs to pay artificially inflated prices for the crop protection products that are essential to their business.

2.      Federal law rewards manufacturers who develop a new active ingredient for a crop protection product with a lengthy period of exclusivity rights. During that period, the manufacturer effectively acts as a monopolist, safe in the knowledge that federal law prohibits any rival from selling any competing product containing the same ingredient. Those exclusivity

2

rights act as a powerful incentive for companies to develop new active ingredients to ward off pests more effectively.

3. At the same time, these federal exclusivity rights do not last forever. Once the rights expire, the market for the active ingredient is, by design, open to competition. Generic manufacturers can enter the market and sell their own products containing the same active ingredients. Sometimes, generic products use the same formula as the brand name product but retail at a significant discount. Other times, generic manufacturers develop new and innovative crop protection products using the same active ingredient. In either case, the original manufacturer must respond to the new competitive threat by offering a better value for its own product—or else see its sales volume drop. This vigorous competition has salutary effects throughout the market. But the ultimate beneficiaries are farmers, who gain access to cheaper products and a wider range of choices.

4. Federal law thus strikes a balance between two competing objectives: incentivizing the development of innovative new active ingredients on the one hand and unlocking the benefits of a free and competitive market on the other.

5. For each Defendant in this case, however, the extensive exclusivity rights provided under federal law were not enough. Each Defendant has unlawfully sought to effectively extend its monopoly over its active ingredients long after the law stopped allowing it to do so.

6. Specifically, each Defendant use so-called "loyalty programs" to unlawfully protect its market position. Under the loyalty programs, Defendants pays substantial sums of money to distributors—the middlemen who purchase directly from manufacturers before the product is sold to farmers—to discourage those distributors from purchasing specified active

3

ingredients from generic manufacturers. Those exclusionary payments, which take the form of rebates, are conditioned on the distributors making a high percentage of their purchases of specified active ingredient from the Defendant producing that product. The value of the rebates is so substantial—and the loyalty thresholds are so high—that distributors are compelled to buy no more than a small fraction of their inventory from generic manufacturers.

7. Defendants also ensure that distributors meet the loyalty thresholds by threatening to punish, and actually punishing, distributors that fail to purchase sufficient volumes of products from Defendants. The punishments include canceling contracts, temporarily denying the distributors access to certain products, and declining to supply the distributor with needed products.

8. Each Defendant has entered into exclusionary loyalty agreements with virtually all of the leading distributors. As a result of these agreements, distributors purchase only minimal volumes of covered crop protection products from generic manufacturers. And without access to the major distributors, generic manufacturers have no viable path to compete with the Defendants in the market for crop protection products containing active ingredients covered by the loyalty provisions. Each Defendant has therefore effectively locked its competitors out of these markets.

9. The consequences of this market foreclosure are severe. Defendants have leveraged the lack of competition in the market to raise prices to artificially inflated levels. Due to Defendants' exclusionary conduct, farmers have paid approximately 20% higher prices—if not more—for certain crop protection products than they would have paid in a competitive market. There is also little innovation in these markets, and farmers often have no choice but to purchase their products from the Defendants. Defendants' anticompetitive conduct has thus

4

forced Plaintiffs and other farmers to pay millions of dollars more in supracompetitive prices while at the same time restricting their ability to benefit from new and innovative products. Plaintiffs and other farmers will continue to suffer from these harmful effects until Defendants' exclusionary and anticompetitive conduct is brought to an end and competition is restored to the market.

## II.     JURISDICTION, VENUE, AND INTERSTATE COMMERCE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than one hundred members of the class; and at least one member of the class is a citizen of a state different from that of one of Defendants.

11.     In the alternative, the Court has jurisdiction over this action pursuant to sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2. Plaintiffs request declaratory and equitable relief and seek to recover overcharges and treble damages for injuries sustained by Plaintiffs and the Class resulting from Defendants' anticompetitive agreements and unlawful foreclosure of competition in the Relevant Market and Submarkets that maintained and enhanced Defendants' dominant position and monopoly power. Given that Plaintiffs seek declaratory and equitable relief for these violations of the Clayton Act and the Sherman Antitrust Act, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a). The Court possesses supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

12.     Venue is proper in this Court pursuant to, among other statutes, section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391 because each Defendant regularly transacts business within this district, a substantial part of the events giving rise to Plaintiffs' claims

occurred in this District, one or more of Defendants resided in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

13.    Defendants' activities were carried out within the flow of interstate commerce of the United States and were intended to, and did have, direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

## III.    PARTIES

### A.    Plaintiff

14.    Plaintiff Clint Meadows is a corn and soybean farmer who resides in the State of Missouri. Mr. Meadows purchased Syngenta/Corteva products at issue in this case during the Class Period.

15.    Plaintiff Michael Shows is a corn and soybean farmer who resides in the State of Illinois.  Mr. Shows purchased Syngenta/Corteva products at issue in this case during the Class Period.

16.    Plaintiff Matt Taylor is a farmer who farms citrus products and row crops and resides in the State of Florida. Mr. Taylor purchased Syngenta/Corteva products at issue in this case during the Class Period.

### B.    Defendants

#### 1.    Syngenta Defendants

17.    Defendant Syngenta Crop Protection AG is a corporation organized under the laws of Switzerland, with its headquarters in Basel, Switzerland. Syngenta Crop Protection AG is an indirect subsidiary of Sinochem Holdings Corporation Ltd., a corporation based in Beijing, China.

6

18.     Syngenta Corporation is a corporation organized under the laws of Delaware, with its headquarters in Wilmington, Delaware. Syngenta Corporation is a corporate affiliate of Syngenta Crop Protection AG.

19.     Syngenta Crop Protection, LLC is a limited liability company organized under the laws of Delaware, with its headquarters in Greensboro, North Carolina. Syngenta Crop Protection, LLC is a corporate affiliate of Syngenta Crop Protection AG.

20.     Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Protection, LLC are referred to collectively as "Syngenta."

### 2.     Corteva Defendant

21.     Corteva, Inc. is a publicly held corporation organized under the laws of Delaware, with its headquarters in Indianapolis, Indiana.

22.     Corteva, Inc. is referred to as "Corteva."

23.     Corteva is a product of the mergers of Dow and DuPont, which occurred in 2011. In 2015, the merged entity, DowDuPont, formed Corteva. In 2019, DowDuPont spun off Corteva into a separate company.

## IV.     FACTS

### A.     Background

#### 1.     Crop-Protection Product Industry

24.     Crop production is a cornerstone of the United States economy. The U.S. agricultural sector produces hundreds of billions of dollars' worth of crops every year. In 2021, the U.S. produced more than $86 billion worth of corn alone.

25.     To protect their crops, farmers rely on crop protection products. Crop protection products are products that kill, repel, prevent, or mitigate the impact of pests that threaten the health of crops. The use of crop protection products increases crop yields and contributes to more

7

efficient production of crops. Every year, U.S. farmers spend more than ten billion dollars on crop protection products.

26.     Crop protection products are a type of pesticide. Most pesticides sold in the United States are crop protection products.

27.     To kill or otherwise control pests, crop protection products contain one or more "active ingredients." An active ingredient, also known as an "AI," is the actual chemical substance that acts on the pest to kill or otherwise control it. A crop protection product may contain only one active ingredient, or it may contain mixtures of different active ingredients.

28.     Crop protection products also include "inert ingredients." These ingredients may contribute to the effectiveness and usability of the crop protection product but do not themselves kill or otherwise control the pest. For instance, an inert ingredient might make it easier to apply the product on a crop or it might improve the product's shelf life.

29.     There are three main types of crop protection products, each of which corresponds to a type of pest that threatens crops. Herbicides, the most common type of pesticide, are used to protect crops from other plants. Insecticides are used to protect crops from insects. Fungicides are used to protect crops from fungi.

30.     An active ingredient operates through what is known as a "mode of action." A "mode of action" refers to the chemical and biological mechanism by which an active ingredient affects a pest, causing it to be killed or otherwise controlled.

31.     Active ingredients are not interchangeable. Active ingredients differ on a number of dimensions, including: (1) what crop or crops they may be used on; (2) when in the growing cycle they may be used; (3) whether they are used in herbicides, insecticides, or fungicide; (4)

what specific pest or pests they are designed to target; (5) their efficacy in protecting crops from pests; and (6) their suitability for use in different locations, weather, or climates.

32.     Because active ingredients are not interchangeable, farmers who use an active ingredient for one purpose will often not be able to readily substitute that active ingredient with a different active ingredient. Farmers may prefer the specific characteristics of a specific active ingredient, and alternatives to that active ingredient may not achieve the same results. In consequence, a generic crop protection product that shares the same active ingredient or ingredients as a branded crop protection product is a closer substitute for that branded crop protection product than other crop protection products that contain different active ingredients.

33.     Active ingredients are sometimes sold before they have been processed and mixed into a final crop protection product. Active ingredients sold in this manner are referred to as "technical grade" or "manufacturing use" active ingredients.

### 2.     Regulatory Framework for Crop Protection Products

34.     When a company develops a new active ingredient for use in crop protection products, federal law entitles that company to protection from competition for that active ingredient for a limited period of time. Two legal frameworks provide this protection.

35.     First, a company that has developed a new active ingredient may apply for U.S. patent protection. Under U.S. patent law, a company that successfully obtains a patent gains twenty years of exclusive use of that invention starting on the day that patent was issued.

36.     Second, the Federal Insecticide, Fungicide, and Rodenticide Act, also known as FIFRA, provides certain exclusivity protections for companies that develop a new active ingredient and obtain regulatory approval for that ingredient. Specifically, a company seeking to sell a new active ingredient must first obtain approval from the federal Environmental Protection Agency, or EPA, to ensure that the pesticide will not cause unreasonable harm to human health

9

or the environment. In order to obtain such approval, the applicant must submit substantial scientific data to the EPA about the health and environmental effects of the pesticide.

37. Once the EPA has approved the new active ingredient, the applicant gains exclusive rights to use the scientific data it provided to the agency for a period of ten years. This ten-year period functionally serves as a separate exclusivity period in which other companies cannot use the active ingredient. This ten-year period frequently ends after the date of patent expiration and, in practice, extends the length of time in which the company that developed the active ingredient possesses exclusive rights to sell it.

38. Both the patent system and the FIFRA approval system incentivize innovation. Companies that develop a new active ingredient are rewarded with a substantial period of time in which they may market crop protection products containing the active ingredient free of competition from rival companies.

39. At the same time, both of these legal frameworks are, by design, limited in time. Once the protections provided by patent law and FIFRA expire, federal law deliberately opens the market up to competition. At that point, a company that did not develop a given active ingredient may nevertheless manufacture and sell crop protection products containing that active ingredient. Such a company's products are still subject to the FIFRA regulatory approval process, but it may rely on the original developer's data to obtain regulatory approval (in some cases in exchange for payments to the original developer of the active ingredient).

40. The period of time after which the exclusivity rights provided under patent law and FIFRA have expired is commonly known as the "post-patent" period. Active ingredients that are no longer subject to those regimes are known as "post-patent" active ingredients.

**3.    Crop Protection Product Supply Chain**

41. Crop protection products are manufactured by crop protection manufacturers. There are both "basic" and "generic" manufacturers. Basic manufacturers both (1) research and develop new active ingredients and (2) manufacture and sell crop protection products containing those ingredients. Generic manufacturers only manufacture and sell crop protection products containing active ingredients that other companies have developed. As a result, basic manufacturers benefit from the exclusivity rights provided by U.S. law while generic manufacturers typically only enter the market once the exclusivity rights belonging to basic manufacturers have expired.

42. Syngenta and Corteva are both basic crop protection product manufacturers. Both companies develop and market their own drugs. Globally, Syngenta's crop protection sales amounted to approximately $13 billion in FY 2021. Globally, Corteva's crop protection sales amounted to approximately $7 billion in FY 2021.

43. There are more than a dozen generic manufacturers of crop protection products in the United States.

44. Generic manufacturers are capable of producing crop protection products that are equivalent to the crop protection products sold by basic manufacturers like Syngenta and Corteva. As one owner of an independent dealer of crop protection products put it, generics "are the same products as the name brand."

45. In the crop protection industry, manufacturers usually sell directly to distributors. The seven largest distributors include: Helena Agri-Enterprises; Nutrien Ag Solutions; Growmark; WinField Solutions; J.R. Simplot Company; Wilbur-Ellis; and CHS Inc.

11

46.     Distributors usually sell directly to retailers. There are many more retailers than there are distributors. Some retailers are integrated with distributors. Retailers are typically located near to the farmers who purchase directly from them.

47.     This chain of sales—from manufacturers to distributors to retailers—is known in the crop protection product industry as the "traditional distribution channel." More than 90% of sales of crop protection products runs through the traditional distribution channel, and more than 90% of sales through the traditional distribution channel run through the seven largest distributors. In consequence, more than 80% of sales of crop protection products run through the seven largest distributors.

48.     It would be inefficient for manufacturers to bypass distributors and sell directly to retailers or farmers. Distributors typically have access to a large preexisting base of customers, while manufacturers do not. Distributors also have access to warehouses, transportation, and other key logistical resources that manufacturers typically do not possess. Manufacturers do not usually have expertise or experience in widely distributing their products to retailers or farmers. For those reasons, as one former employer for Corteva put it, manufacturers do not sell crop protection products directly to growers.

49.     In short, there are no viable, cost-effective alternatives to selling through the traditional distribution channel.

**B.     Relevant Active Ingredients**

50.     Six active ingredients are relevant to this case. Three of those active ingredients are sold by Syngenta: azoxystrobin, mesotrione, and metolachlor (collectively, the "Syngenta AIs"). Three of those active ingredients are sold by Corteva: rimsulfuron, oxamyl, and acetochlor (collectively, the "Corteva AIs"). This Complaint refers to the Syngenta AIs and the Corteva AIs as, collectively, the "Relevant AIs."

12

### 1. Syngenta AIs

51.     Azoxystrobin is a broad-spectrum fungicide that protects a wide variety of crops from fungal diseases. Global annual sales of azoxystrobin total over $1 billion.

52.     A Syngenta predecessor company initially developed, patented, and registered azoxystrobin with the EPA. Syngenta's statutory exclusivity rights relating to azoxystrobin, namely its exclusive-use period under FIFRA and relevant patent protection, have both expired.

53.     Syngenta sells azoxystrobin as the product Quadris. Syngenta publicly touts Quadris as a superior product, claiming that it provides "complete plant protection," offers effective control of "all four classes of fungi," and "optimizes" yield and quality by helping the plant to efficiently use resources. Azoxystrobin is also the sole active ingredient in Syngenta's product Heritage, which Syngenta describes as a "unique" fungicide with "a novel mode of action."

54.     Syngenta also sells mixed-ingredient fungicide products that include azoxystrobin, such as Miravis Neo and Trivapro. Syngenta advertises Miravis Neo as setting "the standard in its class for broad-spectrum disease control and plant-health benefits." Syngenta sells Trivapro as "the hardest-working, longest-lasting fungicide."

55.     Mesotrione is a frequently used corn herbicide.

56.     Syngenta and its affiliates initially developed, patented, and registered mesotrione with the EPA. Syngenta's statutory exclusivity rights relating to mesotrione, namely its exclusive-use period under FIFRA and relevant patent protection, have both expired.

57.     Syngenta sells mesotrione as the product Callisto. Syngenta's advertising claims that Callisto provides residual broadleaf weed control, flexible timing, and "exceptional" crop safety.

58.     Mixed-ingredient herbicide products sold by Syngenta, such as Lumax EZ and Acuron, also include mesotrione. Syngenta sells Lumax EZ as enabling "one-pass weed control in corn with a single product for broader-spectrum control" while crowning Acuron as the product that "outperforms and outyields all other corn herbicides."

59.     Metolachlor is an herbicide. It is applied to a range of crops including corn, soybeans, grain sorghum, cotton, peanuts, potatoes, vegetables, sunflowers, and sugar beets. This Complaint uses the term "metolachlor" to refer to both the original metolachlor compound and the subsequent s-metolachlor variant, as described below.

60.     A Syngenta predecessor company developed, patented, and registered the original metolachlor compound with the EPA in or about 1976. Syngenta's relevant patent protection for the original metolachlor expired in or about 1996. A Syngenta predecessor company also developed, patented, and registered s-metolachlor, a variant of the original compound. Syngenta's statutory exclusivities relating to s-metolachlor, namely its exclusive-use period under FIFRA and relevant patent protection, as well as a patent pertaining to the s-metolachlor manufacturing processes, have all expired.

61.     Syngenta sells metolachlor under brand names that use the term "Dual." There have been multiple iterations of Syngenta's "Dual" product, the most recent of which is the Dual II Mangum herbicide. According to Syngenta, Dual II Mangum provides season-long weed control, eliminates any early-season weed competition that threatens yield production while plants are most vulnerable, and has flexible application timing. Syngenta also sells premixes of Dual and other herbicides.

62.     Most farmers consider the term "Dual" to be synonymous with "metolachlor."

        **2.     Corteva AIs**

63. Rimsulfuron is an herbicide applied to crops including fruit, tree nuts, potatoes, corn, soybeans, peanuts, and tomatoes.

64. Corteva's predecessor company, DuPont, initially developed, patented, and registered rimsulfuron with the EPA. Corteva's relevant patent protection for rimsulfuron has expired. By 2007, Corteva's FIFRA exclusive-use period had also expired.

65. Corteva sells rimsulfuron as the herbicide product Matrix SG, which, according to Corteva, delivers contact and extended soil residual control of grasses and broadleaf weeds.

66. Rimsulfuron is commonly known as Realm-Q, which is the brand name for a mixed-ingredients product sold by Corteva. Corteva advertises Realm-Q as an "excellent" postemergence broadleaf weed control in corn, with a built-in crop safener and several modes of action for control. Additional mixed-ingredient products under which Corteva sells rimsulfuron include Basis and Resolve-Q. Corteva publicly claims that Basis provides "dependable, broad-spectrum weed control, even under cool, wet conditions." Corteva claims that Resolve-Q provides "immediate" contact control followed by a "strong" residual activity to prevent later emerging weeds and grasses from competing with corn.

67. Oxamyl is an insecticide and nematicide. It is predominantly applied to cotton and potatoes, but it is also used on onions, apples, citrus fruits, pears, carrots, peppers, tomatoes, and tobacco.

68. Corteva's predecessor company DuPont initially developed, patented, and registered oxamyl with the EPA. Corteva's relevant patent protection for oxamyl has expired. By 1987, Corteva's FIFRA exclusive-use period had also expired.

69. Corteva sells oxamyl as the product Vydate L, which Corteva advertises as an "effective, fast-acting control" against a spectrum of yield-robbing pests across multiple life stages.

70. Acetochlor is an herbicide that is used primarily on corn but can also be applied to cotton, soybeans, sunflowers, peanuts, potatoes, and sugarcane.

71. In 1994, the EPA granted registration for acetochlor to the Acetochlor Registration Partnership ("ARP"), a joint venture of basic manufacturers that continues to hold the U.S. registration for acetochlor. ARP's current partners are Corteva and Bayer. Bayer manufactures acetochlor for itself and Corteva. The relevant patent protection for acetochlor has expired.

72. Corteva's statutory exclusivities relating to acetochlor, namely its exclusive-use period under FIFRA and relevant patent protection, both expired in or about 2007.

73. Corteva sells acetochlor products that do not contain other active ingredients, such as under the brand name Surpass NXT. Corteva also sells acetochlor in combination with other herbicides, such as under the brand name Keystone LA.

## C. Market Definition and Monopoly Power

74. For each of the Relevant AIs—azoxystrobin, mesotrione, metolachlor, rimsulfuron, oxamyl, acetochlor—there exist two relevant markets that are pertinent to this Complaint: (1) a relevant market for the active ingredient itself, whether sold as part of a crop protection product or on its own, and (2) a relevant market for crop protection products that contain the active ingredient.

75. More specifically, there exist two relevant markets for each of the six Relevant AIs are defined as follows:

(a) a relevant product market that is no broader than the active ingredient, consisting of (1) active ingredient included as a component of an EPA-registered finished crop-protection product for sale in the United States, and (2) technical grade or manufacturing use active ingredient to be formulated into an EPA-registered finished crop-protection product for sale in the United States; and

(b) a relevant product market(s) also that is no broader than EPA-registered crop-protection products for sale in the United States that contain the active ingredient.

76. The aforementioned twelve markets are referred to as the "Relevant Markets" in this Complaint.

77. Each Relevant AI is distinctive, both from each other and from other active ingredients. Several features that distinguish Relevant AIs from one another include what pest or pests the active ingredient targets; how effectively the active ingredient controls the targeted pest or pest, generally assessed in terms of yield crop improvements; the crops for which an active ingredient is suited and registered to be used, often linked to geography; the applicability of the active ingredient during various stages of the growing cycle; and the impact of climate and weather conditions on the performance of the active ingredient.

78. Azoxystrobin facilitates simple pesticide management as it can be applied to all major row crops. According to Syngenta, azoxystrobin has growth-enhancing effects that are unique among active ingredients.

79. Mesotrione has superior efficacy and crop safety, as well as a lower use rate, as compared to other, similar herbicide active ingredients. According to a former employee of a distributor, Growmark, mesotrione is "in its own class" and there is no comparable active ingredient.

17

80.     Metolachlor has superior water solubility as compared to other, similar herbicide active ingredients, and thus generally performs better in dry conditions. Metolachlor also maintains superior performance as compared to active ingredients in warmer conditions. Further, it is more "crop friendly" and can be applied to a wider range of crops. According to a former employee of Growmark, a distributor, metolachlor may be preferred over a similar active ingredient because it has a slower release and lasts longer.

81.     Rimsulfuron boasts a number of advantages compared to other, similar herbicide active ingredients, including that it can be applied to a broader spectrum of crops, controls a wider range of weeds, can be used both pre- and post-emergence, and has more application methods, no dormancy restrictions, and a lower use rate. Compared to other, similar herbicide active ingredients, rimsulfuron is also inexpensive to produce.

82.     Products containing oxamyl can be sprayed directly onto crops. By contrast, other, similar insecticide active ingredients must be applied at the root level or mixed into the soil. Compared to other, similar herbicide active ingredients, oxamyl is also safer for crops and better for soil health.

83.     Acetochlor generally outperforms other similar, herbicide active ingredients in wetter and cooler conditions. Acetochlor also tends to maintain superior effectiveness against certain weed species as well as superior weed control in the early growing season. According to a former Corteva employee, "there [is] not a direct substitute for acetochlor that is applied for the exact same factors."

84.     Given the distinct attributes of each Relevant AI, other active ingredients are inadequate substitutes for each Relevant AI.

18

85.     Even where there are similarities between the applications of a Relevant AI and another active ingredient, the similarities are not so significant as to prevent a hypothetical monopolist of any given Relevant AI from profitably raising prices above competitive levels over several years or longer.

86.     The relevant geographic market is the United States. Crop protection products are regulated on the federal level through statutes like FIFRA. It is illegal for farmers in the United States to use active ingredients that have been labeled for use outside the United States.

87.     There are substantial barriers to entry for generic manufacturers to sell protection products. Obtaining federal regulatory approval can be expensive and time-consuming, and it can be expensive to pay the manufacturer that developed an active ingredient for the use of their data, which may be needed to obtain approval. Sourcing ingredients and developing a process for manufacturing the active ingredients may also be costly. According to a former employee of Wilbur-Ellis, a distributor, the cost of active ingredients, labor, and capital can be a significant barrier to entry. According to that employee, a large basic manufacturer like Corteva can achieve "economies of scale" that are difficult for generic manufacturers to match.

88.     As described below, entry into the Relevant Markets is also constrained by Defendants' exclusionary loyalty programs. Those loyalty programs deny generic manufacturers access to large distributors, the most efficient entry point into the market.

89.     Syngenta possesses monopoly and market power in both the relevant markets for the Syngenta AIs—azoxystrobin, mesotrione, and metolachlor—and the relevant markets for the crop protection products that contain the Syngenta AIs. Syngenta has possessed both monopoly and market power in each of those markets throughout the Class Period.

90.     Corteva possesses monopoly and market power in both the relevant markets for rimsulfuron and oxamyl and the relevant markets for crop protection products that contain those active ingredients. Corteva has possessed both monopoly and market power in each of those markets throughout the Class Period.

91.     Corteva possesses market power in both the relevant market for acetochlor and the relevant market for crop protection products that contain acetochlor. Corteva has possessed market power in those markets throughout the Class Period.

92.     The strongest evidence that Syngenta and Corteva possessed monopoly power (i.e., power to impose artificially high prices in the Relevant Markets) is that they actually imposed artificially high prices in the Relevant Markets. As detailed below, Syngenta and Corteva raised their prices to artificially high levels and used their exclusionary loyalty programs to exclude competition from the Relevant Markets. Their exclusionary schemes could not have functioned had they not had market power in the Relevant Markets.

93.     Syngenta's and Corteva's monopoly power  is also shown through their market shares in each of the Relevant Markets.

94.     Syngenta maintains a dominant market share in each of the Relevant Markets for the Syngenta AIs.

95.     Corteva maintains a dominant market share in each of the Relevant Markets for rimsulfuron and oxamyl.

96.     Corteva also maintains a substantial market share in the Relevant Markets for acetochlor. Although Bayer also competes in the Relevant Markets for acetochlor, Bayer's participation in that market has not constrained Corteva's ability to impose artificially high

prices on its products in that market, as demonstrated by the fact that Corteva has in fact imposed artificially high prices through its exclusionary loyalty programs.

      **D.**      **Syngenta's and Corteva's Exclusionary Loyalty Programs**

97.      Both Syngenta and Corteva use "loyalty programs" to exclude competitors from the Relevant Markets during the post-patent period when they no longer have any exclusivity rights to the Relevant AIs. Those loyalty programs have the intended and actual effect of blocking generic manufacturers from producing crop protection products containing the Relevant AIs. In consequence, these loyalty programs have allowed Syngenta and Corteva to maintain their monopoly and/or market power in each of the Relevant Markets, enabling them to charge supracompetitive prices for the Relevant AIs and their crop protection products containing the Relevant AIs.

98.      As one former executive for a generic manufacturer put it, "when products come into a post-patent environment," the basic manufacturers who developed the product "limit the amount of market share that they're willing to give to generics."

99.      The loyalty programs work as follows. Each Defendant enters into "loyalty agreements" with each of the major distributors. The agreements offer substantial exclusionary payments to the distributors in the form of rebates if those distributors limit their purchases of crop protection products containing specified active ingredients. Specifically, for each Relevant AI, in order to receive an exclusionary payment, a distributor needs to purchase a very high percentage of their crop protection products from the Defendant that manufactures that Relevant AI. If the distributors fail to meet that loyalty threshold in a given year, they do not receive an exclusionary payment.

100.      Because eligibility for the exclusionary payments is based on an entire year's worth of sales, the payments only are sent out after the year in question is over. For instance, a

loyalty agreement might be calculated based on purchases over the course of a fiscal year, which ends on August 31. But the exclusionary payment from the manufacturer might not be paid out until the following December or January.

101. A former employee of Growmark, a distributor, explained that the loyalty programs meant that if Growmark hit certain benchmarks, "we'd have a kicker of 2% to 3% more per product." The exclusion payments could be "sizable." In some cases, according to the former Growmark employee, "you could earn 20% or more back on particular products."

102. A former employee of Wilbur-Ellis, a distributor, said that manufacturers talked to distributors in terms of "loyalty." For instance, according to the employee, a manufacturer might tell a distributor, "We want you to be 80% loyal on this active ingredient." As the former employee explained, that statement meant that the manufacturer wanted the distributor to purchase 80% percent of the total volume of a specific active ingredient from the manufacturer in the upcoming year. The manufacturers' payment to the distributor would be conditioned on the distributor hitting that target.

103. A former executive for a generic company provided an example of how a loyalty agreement might operate. A distributor like "Crop Production Services [now named "Nutrien Ag Solutions"] or Helena" has "to maintain a certain percentage, usually a very high percentage, 90 percent of their buying purchases from a company, such as Syngenta, to maintain the rebates." The loyalty agreements, according to the executive, "leave[] very limited market share access for . . . generics to participate in."

104. The exclusionary payments that Syngenta and Corteva are so significant, and the percentage thresholds that distributors must meet to receive those payments are so high, that distributors purchase few if any products containing the Relevant AIs from manufacturers other

22

than Syngenta and Corteva. Even in circumstances where the purchase of additional generic products would not cause distributors to drop beneath the percentage threshold, distributors often decide not to purchase generic products because of the risk that unexpected developments—like a sudden change in farmer demand near the end of the year—might cause them to drop beneath the threshold.

105.    One chart prepared by Syngenta summarized how falling beneath a loyalty threshold could severely impact a distributor's bottom line. The chart shows that if a distributor purchased more than 4% of its azoxystrobin products from generic manufacturers instead of from Syngenta, it would lose out on rebates from Syngenta and lose money overall. The chart also shows that the customer would lose money by purchasing more than 4% of its azoxystrobin products from Syngenta unless it could purchase more than 60% of its azoxystrobin from generic manufacturers instead of from Syngenta. Due to Syngenta's dominant market share and other factors, purchasing that volume of azoxystrobin products from generic manufacturers is not a viable alternative for a distributor. In consequence, a distributor subject to this agreement would be strongly incentivized to purchase more than 96% of its azoxystrobin products from Syngenta instead of from generic manufacturers.

106.    In addition to the "carrots" they offer in the form of exclusionary payments, both Syngenta and Corteva further ensure compliance with their loyalty thresholds by using "sticks" to keep distributors in line. Both Syngenta and Corteva have threatened to punish distributors who fail to meet their loyalty thresholds by canceling contracts, temporarily denying the distributors access to certain products, or declining to supply the distributor with needed products. Both Syngenta and Corteva have followed through on those retaliatory threats,

23

punishing distributors who failed to purchase sufficient volumes of products from the Defendants.

107. Both Syngenta and Corteva entered into loyalty agreements offering substantial rebates to distributors if and only if those distributors agreed to limit their purchases of crop protection products containing the Relevant AIs.

108. Syngenta operates loyalty programs with retailers that sell crop protection products. The loyalty programs are structured similarly to its loyalty programs with distributors. Leading retailers participate in these programs.

109. Syngenta's loyalty agreements covered each of the Syngenta AIs: azoxystrobin, mesotrione, and metolachlor. Syngenta's loyalty program is named the "Key AI" program.

110. With respect to each of the Syngenta AIs, the relevant patent protections expired prior to the Class Period. With respect to each of the Syngenta AIs, the relevant FIFRA exclusivity period ended prior to the Class Period. The entire Class Period therefore overlaps with the post-patent period for each of the Syngenta AIs.

111. In accordance with its loyalty agreements, Syngenta has made substantial exclusionary payments to distributors because those distributors met the percentage thresholds for purchasing products containing each Syngenta AI from Syngenta rather than from competing generic manufacturers. The intended and actual effect of those payments was to discourage distributors from purchasing products containing those active ingredients from generic manufacturers, thereby blocking generic manufacturers from the markets for those active ingredients.

112. Corteva's loyalty agreements covered each of the Corteva AIs: rimsulfuron, oxamyl, and acetochlor. Corteva operates two loyalty programs. One of those programs is

24

named the Crops, Range & Pasture and Industrial Vegetation Management Loyalty Program ("CRPIVM Loyalty Program"). Corteva also offers another discount to distributors, the Corporate Distributor Offer ("CDO").

113. With respect to each of the Corteva AIs, the relevant patent protections expired prior to the Class Period. With respect to each of the Corteva AIs, the relevant FIFRA exclusivity period ended prior to the Class Period. The entire Class Period therefore overlaps with the post-patent period for each of the Corteva AIs.

114. In accordance with its loyalty agreements, Corteva has made substantial exclusionary payments to distributors because those distributors met the percentage thresholds for purchasing products containing each Corteva AI from Corteva rather than from competing generic manufacturers. The intended and actual effect of those payments was to discourage distributors from purchasing products containing those active ingredients from generic manufacturers, thereby blocking generic manufacturers from the markets for those active ingredients.

115. Both Syngenta and Corteva have loyalty agreements with virtually all of the major distributors.

**E.    Anticompetitive Effects of the Exclusionary Loyalty Programs**

116. Through the use of their exclusionary loyalty programs, Syngenta and Corteva substantially foreclosed generic manufacturers from the Relevant Markets, stifled innovation, and imposed supracompetitive prices on farmers.

117. Defendants' exclusionary conduct harmed competition in the Relevant Markets and created and/or maintained Defendants' monopoly and/or market power in the Relevant Markets.

118.    Plaintiffs and the Class—the farmers who purchase crop protection products containing the Relevant AIs—have been harmed by the Defendants' exclusionary conduct in the form of higher prices.

119.    Defendants' exclusionary conduct was not reasonably necessary to achieve any procompetitive objective. To the extent such conduct did achieve any procompetitive objectives, those objectives could have been achieved through means less damaging to competition. Even assuming Defendants' exclusionary conduct was reasonably necessary to achieve any procompetitive objectives, such procompetitive benefits would be substantially outweighed by the harms to competition caused by Defendants' conduct.

120.    Syngenta and Corteva continue to operate loyalty programs that include exclusionary agreements with distributors. This anticompetitive conduct is ongoing, and unless this Court issues injunctive relief, the harms to competition created by these programs will likely continue unabated.

### 1.    Market Foreclosure

121.    Syngenta's and Corteva's loyalty programs have been successful in achieving their exclusionary objectives. Because of the loyalty programs, generic competitors have been driven out of the Relevant Markets or have been unable to gain a foothold in those markets at all. Each Defendant has substantially foreclosed generic competitors from the Relevant Markets.

122.    The traditional distribution channel for crop protection products—from manufacturers to distributors to retailers—is the best and most efficient way for manufacturers to get their products to market. Because more than 80% of the sales of crop protection products runs through just seven distributors, any manufacturer who wishes to find a market for its product must be able to sell its  product to those distributors. Manufacturers who cannot sell their product to the major distributors are competing at a severe disadvantage.

26

123. The Defendants' loyalty programs have blocked generic manufacturers from selling their products through the traditional distribution channel. Because of the importance of that channel, each of the Defendants has foreclosed a substantial share of the applicable Relevant Markets to competition from other manufacturers.

124. To ensure they meet the loyalty thresholds, distributors subject to the loyalty agreements have limited their purchase of products manufactured by generic manufacturers to extremely low levels. Distributors subject to the loyalty agreements have, for instance, removed generic products from price lists, steered customers away from such products, and refused customers' requests to purchase such products outright.

125. The anticompetitive effects of Defendants' loyalty programs are accentuated by the fact that distributors have a great deal of ability to influence farmers decisions about what crop protection products to purchase. As one former executive of a generic manufacturer explained, "the loyalty programs are the big thing because distributors make recommendations to inform farmers." Another person in the industry, an owner of an independent dealer of crop protection products, explained that farmers get scared about the various products and don't know what to do without guidance from distributors.

126. One generic manufacturer says that it is futile to even approach a large distributor that is subject to loyalty requirements.

127. Generic manufacturers are capable of producing quality alternatives to the branded products sold by Syngenta and Corteva in significant volumes. For example, according to one former executive for a generic manufacturer, the azoxystrobin product previously sold by his company was "identical," including "on a percentage basis," to the equivalent product sold by Syngenta.

128.     Generic manufacturers are also capable of generating demand for their products among farmers and retailers. In markets where loyalty programs do not foreclose generic manufacturers from selling into the traditional distribution channel, distributors are willing to purchase crop protection products from generic manufacturers, and generic manufacturers can make all or nearly all of their sales in the traditional distribution channel.

129.     In a competitive market, distributors would purchase significant volumes of crop protection products sold by generic manufacturers containing each of the Relevant AIs. The additional sales would enable generic manufacturers to achieve production efficiencies that they have been unable to achieve due to Defendants' exclusionary conduct.

130.     Absent Defendants' exclusionary conduct, generic manufacturers would be able to compete with Syngenta or Corteva in each of the Relevant Markets. Absent Defendants' exclusionary conduct, generic manufacturers would collectively sell volumes of crop protection products in each of the Relevant Markets that would significantly exceed the amounts currently allowed under Defendants' loyalty agreements with distributors.

131.     Each of the Relevant Market has been substantially foreclosed to competition from generic manufacturers for at least five years, dating back to before the beginning of the Class Period.

132.     The loyalty programs operated by the Defendants have such a severe exclusionary impact that they can foreclose the Relevant Markets to generic manufacturers that are equally as efficient as the Defendants. Equally efficient competitors may be foreclosed from the Relevant Markets even when the Defendants are not engaging in predatory pricing (i.e., even when the Defendants are selling their products are a higher price than the price of producing the product).

133. The market foreclosure caused by the Defendants' loyalty programs does not depend upon whether the loyalty agreements actually commit distributors to selling a certain percentage threshold of their products from Syngenta or Corteva. Even if no contractual commitment exists, the exclusionary payments offered under the loyal agreements can be enough of an incentive for distributors to minimize their purchases from generic manufacturers and meet the percentage thresholds specified in the loyalty agreements. In consequence, distributors adhere to these agreements even when the agreements do not include a promise by the distributor to meet the specified percentage threshold.

134. Because substantially all of the leading distributions have loyalty agreements with the Defendants, distributors know that other distributors will also be strongly incentivized to make all or nearly all of their purchases of products containing the Relevant AIs from the Defendants. As one former employee of Wilbur-Ellis, a distributor, put it, loyalty programs are "an industry norm." As a result, distributors know that their competitors are unlikely to undercut them on price by purchasing cheaper generics, which in turn makes it less likely that any given distributor will feel pressure to purchase more generics for resale. This fact enhances the exclusionary effects of the Defendants' loyalty programs.

135. Syngenta's loyalty programs with major retailers exacerbate the exclusionary effects of its loyalty programs with distributors. Like the distributor programs, the retailer programs cut off generic manufacturers from critical links in the traditional distribution channel.

136. In each Relevant Market, Syngenta's or Corteva's exclusionary conduct has pushed generic manufacturers out of the market, delayed generic manufacturers' entry into the market, constrained generic manufacturers' ability to expand, and/or denied generic manufacturers entry into the market altogether.

29

137.     According to one former executive for a generic manufacturer, loyalty programs made it difficult for his company to enter the market. He said, "we ran up against these [loyalty] programs and couldn't get some distributors" to sell his company's generic product.

138.     In the Relevant Markets for azoxystrobin, Syngenta has used its loyalty programs to substantially foreclose the market to competition from generic manufacturers. Syngenta paid substantial rebates to distributors and retailers for the purpose of getting them to limit their purchases of products containing azoxystrobin from generic manufacturers. In consequence, distributors have declined to purchase all but a small fraction of their products containing azoxystrobin from companies other than Syngenta.

139.     A number of generic manufacturers have attempted to sell azoxystrobin products in the United States. Those products were priced much more competitively than Syngenta's azoxystrobin products. Nevertheless, due to Syngenta's loyalty programs, distributors have been unwilling to purchase more than minimal amounts of azoxystrobin.

140.     One generic manufacturer decided not to introduce an azoxystrobin product because of the market foreclosure caused by Syngenta's loyalty programs.

141.     In the Relevant Markets for metolachlor, Syngenta has used its loyalty programs to substantially foreclose the market to competition from generic manufacturers. Syngenta paid substantial rebates to distributors and retailers for the purpose of getting them to limit their purchases of products containing metolachlor from generic manufacturers. In consequence, distributors have declined to purchase all but a small fraction of their products containing metolachlor from companies other than Syngenta.

142.     Around 2003, generic manufacturers attempted to enter the markets for metolachlor, but they were unsuccessful. Other efforts by generic manufacturers to enter the market have either been terminated or delayed due to Syngenta's loyalty programs.

143.     In the Relevant Markets for rimsulfuron, Corteva has used its loyalty programs to substantially foreclose the market to competition from generic manufacturers. Corteva paid substantial rebates to distributors and retailers for the purpose of getting them to limit their purchases of products containing rimsulfuron from generic manufacturers. In consequence, distributors have declined to purchase significant volumes of products containing rimsulfuron from companies other than Corteva.

144.     Prior to the Class Period, Corteva's predecessor company, DuPont, implemented a loyalty program that applied to rimsulfuron. Corteva implemented a loyalty program for rimsulfuron beginning in the 2017-2018 market year.

145.     Although generic manufacturers have registered products containing rimsulfuron in the United States, their efforts to compete with Corteva and its processor company have largely been unsuccessful.

146.     In the Relevant Markets for oxamyl, Corteva has used its loyalty programs to substantially foreclose the market to competition from generic manufacturers. Corteva paid substantial rebates to distributors and retailers for the purpose of getting them to limit their purchases of products containing oxamyl from generic manufacturers. In consequence, distributors have declined to purchase all but a small fraction of their products containing oxamyl from companies other than Corteva.

147.     Between 2015 and 2017, a Corteva plant that produced oxamyl experienced a prolonged outage. In response to the disruption in Corteva's production, generic manufacturers

31

began selling product containing oxamyl beginning around 2017 and 2018. Initially, generic entry into the market was successful.

148.    However, Corteva implemented a loyalty program before the 2018-2019 market year. Corteva's loyalty program succeeded in getting distributors to drop their purchases of oxamyl products. The market share of the generic manufacturers collapsed, even as the generic manufacturers reduced the price of their products to make them more appealing.

149.    In the Relevant Markets for acetochlor, Corteva has used its loyalty programs to substantially foreclose the market to competition from generic manufacturers. Corteva paid substantial rebates to distributors and retailers for the purpose of getting them to limit their purchases of products containing acetochlor from generic manufacturers. In consequence, distributors have declined to purchase a significant amount of their products containing acetochlor from companies other than Corteva.

150.    Corteva implemented a loyalty program for acetochlor beginning in the 2016-2017 market year.

151.    Although the first generic manufacturer of acetochlor entered the market in 2018, generic manufacturers have had little success in getting distributors to purchase their products.

152.    Bayer, a basic manufacturer, also produces some products containing acetochlor. However, Bayer does not price its acetochlor at levels that put substantial pressure on Corteva's pricing, and Bayer's presence in the market has not deterred Corteva from pricing its products at supracompetitive levels.

### 2.    Lack of Innovation

153.    Syngenta's and Corteva's loyalty programs have hampered innovation in the Relevant Markets, reducing farmers' access to new and creative products.

32

154.    Once the exclusivity rights belonging to a basic manufacturer expire, generic manufacturers have the opportunity not just to sell products that mimic the crop protection products sold by the basic manufacturer but also to sell new, innovative products. Those new products may use a different combination of active ingredients, vary the percentages of the different active ingredients in a mixture, or use different inert ingredients. Such innovation occurs frequently in competitive markets for crop protection products.

155.    Because Syngenta and Corteva have effectively blocked generic manufacturers from entering the Relevant Markets, generic manufacturers have not had the opportunity to develop new and innovative products that make use of the Relevant AIs. Indeed, generic manufacturers have on several occasions halted plans to develop new innovative products using those active ingredients—or declined to incorporate one of those active ingredients into a new innovative product—because of the Defendants' exclusionary loyalty programs.

156.    In consequence of Syngenta's and Corteva's exclusionary conduct, farmers have access to an artificially limited number of options to choose from when purchasing crop protection products.

### 3.    Supracompetitive Prices

157.    Because Syngenta's and Corteva's exclusionary loyalty programs foreclose generic manufacturers from entering the Relevant Markets, these programs lead farmers to pay artificially inflated prices for crop protection products that contain the Relevant AIs.

158.    Generic crop protection products are typically priced at lower levels than branded products in the same market. By blocking generic products from the market, Syngenta and Corteva have denied farmers the option of buying a cheaper generic product that would serve the farmers' purposes just as well as a branded product containing the same active ingredient.

33

159.    Many farmers who purchase crop protection products containing the Relevant AIs from the Defendants would not prefer Defendants' products to a similar product produced by a generic manufacturer. Instead, these farmers purchase Defendants' products because Defendants' loyalty programs mean that no other alternative product is available or no other product is marketed by distributors or retailers.

160.    Absent the Defendants' exclusionary conduct, many farmers would choose to purchase cheaper crop protection products produced by generic manufacturers that are not currently available to them.

161.    Moreover, the entry of generic crop protection products into the market puts downward price pressure on every manufacturer in the market. As a result, in a competitive market, Syngenta and Corteva would charge less for their products containing the Relevant AIs than they do today. Thus, even farmers who prefer to purchase the Defendants' products than purchase a cheaper generic alternative, and who would do so in a competitive market as well, nevertheless pay inflated prices due to Defendants' loyalty programs relative to what they would pay in a competitive market.

162.    The entry of generic crop protection products into the market puts downward pricing pressure on the prices of both products containing one active ingredient and mixture products that contain multiple active ingredients. The entry of a generic product containing an active ingredient into the market puts downward pressure on the prices of mixture products containing that active ingredient even if the generic product does not contain the same combination of active ingredients as the mixture product.

163.    To the extent generic manufacturers have been able to make limited inroads in the Relevant Markets, the Defendants' loyalty programs have still constrained the growth of those

34

companies and their ability to put downward pressure on prices in the Relevant Markets. Thus, even insofar as generic manufacturers have been able to sell some products in the Relevant Markets, prices in those markets are still inflated relative to what they would be in a competitive market.

164.     Crop protection products are typically sold to distributors and retailers before they are sold to farmers. Yet distributors and retailers can and do pass on the cost of the crop protection products when they sell those products. As a result, distributors and retailers recoup the cost of any overcharge associated with Defendants' exclusionary conduct by charging an inflated price to sell the product to farmers. Because Plaintiffs and other farmers are the end-consumers who use crop protection products rather than reselling them, they are the ones who ultimately pay for the overcharge associated with Defendants' exclusionary conduct.

165.     While distributors pass on the price increase associated with Defendants' exclusionary conduct, they do not typically pass on the exclusionary payments they receive under the loyalty programs in the form of decreased prices. The loyalty programs are complicated, and farmers are frequently not aware of the details of the programs. Exclusionary payments under the loyalty programs also are made on a deferred basis rather than at the time the distributor purchases products from Syngenta or Corteva. For all those reasons, distributors are generally able to retain the loyalty payments as profit instead of using them to offer lower prices that could benefit farmers.

166.     Thus, the inflated prices farmers must pay due to Defendants' exclusionary conduct are not offset by any price decreases or rebates passed down due to the exclusionary payments made by Defendants to distributors.

167.    Due to Defendants' exclusionary conduct, farmers have paid approximately 20% higher prices—if not more—for products in the Relevant Markets than they would have in a competitive market.

168.    In countries where loyalty programs do not block generic manufacturers from competing in the markets associated with the Relevant AIs, Syngenta and Corteva have been forced to price their products much more competitively than they do in the United States. In those countries, prices for products containing the Relevant AIs are lower than they are in the United States.

169.    As Figure 1 shows, in Germany, the price of Syngenta's azoxystrobin product is only 23% higher than the price of azoxystrobin products produced by generic manufacturers. In the United States, however, the price of Syngenta's azoxystrobin product, Quadris, is 116% higher than the price of generic azoxystrobin products—more than double the generic price. Thus, while generics have put significant downward pricing pressure on the prices of crop protection products containing the Relevant AIs in Germany, the Defendants' loyalty programs have enabled the Defendants to keep prices at artificially high levels in the United States.

**Figure 1**



170.     Preliminary regression analysis conducted by economic experts based on a comparison between Germany and the United States suggests that the lack of competition in the United States has enabled Syngenta and Corteva to maintain prices at staggeringly high levels. As Figure 2 shows, if generic manufacturers were able to put the same pressure on the prices of Syngenta's azoxystrobin products in the United States as they are in Germany, prices for Syngenta's azoxystrobin products in the United States would be 43% lower—nearly half the price they are today. Put otherwise, prices in the United States are 57% higher than they would be if the market was as competitive as Germany's.

Case 1:22-cv-01128-TDS-JEP     Document 1     Filed 12/26/22     Page 37 of 101

**Figure 2**



171.    Table 1 summarizes the results of the regression analysis underlying this conclusion. The number next to "Overcharge (log points)" represents the estimated overcharge associated on azoxystrobin products in the United States, or approximately 57%. The asterisks next to that number represent the statistical significance of those estimates. Here, the statistical significance suggests a confidence level of more than 99%. The percentage next to "Percentage," 43%, represents the estimated drop in the price of Syngenta's azoxystrobin product in the United States if the United States market operated like Germany's.

**Table 1**

|                          | (1)<br>Azoxystrobin<br>Overcharge |
|--------------------------|:-------------------------:|
| Overcharge (log-points)  | 0.567***                  |
|                          | (0.202)                   |
| Percentage               | 43%                       |
| Observations             | 43                        |
| R-squared                | 0.315                     |
| U.S. Fixed Effect        | YES                       |
| Name-Brand Control       | YES                       |

Robust standard errors in parentheses
*** p<0.01, ** p<0.05, * p<0.1

## V.  STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

172.    During the Class Period, Syngenta's and Corteva's conduct constitutes a continuing violation in which the Defendants repeatedly invaded the interests of Plaintiffs and the members of the Class by adhering to, enforcing, reaffirming, and repeatedly re-entering into the exclusionary loyalty agreements that form the basis of this Complaint.

173.    Syngenta and Corteva's conduct also constitutes a continuing violation because Defendants repeatedly sold products containing the Relevant AIs at supracompetitive prices during the Class Period, and each member of the Class paid supracompetitive prices for Defendants' products during the Class Period. Each purchase of a relevant product at supracompetitive prices constitutes a new and distinct injury. A new cause of action accrued every time a member of the Class suffered a new and distinct injury in the form of paying supracompetitive prices.

174.    Thus, even if Defendants engaged in exclusionary conduct prior to the Class Period, and even if certain members of the Class paid supracompetitive prices prior to the Class

39

Period as a result of that exclusionary conduct, each member of the Class suffered at least one new and distinct injury during the Class Period, and each member of the Class possesses a claim premised on such an injury.

## VI. CLASS ACTION ALLEGATIONS

175.    Plaintiffs bring this action on behalf of themselves, and on behalf of members of the following class (the "Class"), under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3):

> All persons and entities in Repealer Jurisdictions who, other than for the purpose of resale, indirectly purchased or paid for a crop protection product containing one or more of the Relevant AIs that was manufactured by one or more of the Defendants at any time during the period from December 27, 2018, through and until the anticompetitive effects of Defendants' challenged conduct cease (the "Class Period").

176.    A Repealer Jurisdiction is a state or district that has repealed the bar on indirect purchaser plaintiffs recovering under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and includes the following: Arizona, California, District of Columbia, Florida, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

177.    The following are specifically excluded from the Class: the Defendants; the officers, directors, and employees of the Defendants; any entity in which the Defendants have a controlling interest; any divisions, subsidiaries, and predecessors of the Defendants; and any

40

affiliate, legal representative, heir, or assign of the Defendants. Also excluded from the Class are: any federal, state, or local governmental entity; any judicial officer presiding over this action and the members of their immediate family and judicial staff; any juror assigned to this action; and any co-conspirator identified during the course of this action.

178. At least tens or hundreds of thousands of persons or entities have indirectly purchased a crop protection product containing a Relevant AI that was manufactured by Syngenta or Corteva during the Class Period.

179. Plaintiffs' claims are typical of the Class.

180. Plaintiffs and all members of the Class were injured in the form of overcharges caused by Defendants' exclusionary conduct.

181. Plaintiffs will fairly and adequately protect and represent the interests of the Class. Plaintiffs' interests are not antagonistic to those of the Class.

182. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

183. Questions of law and fact are common to the members of the Class and predominate over questions, if any, that may affect only individual members because Syngenta and Corteva have acted and refused to act on grounds generally applicable to the entire Class. Such generally applicable conduct is inherent in Syngenta's and Corteva's exclusionary conduct in monopolizing the Relevant Markets, as more fully alleged above.

184. Questions of law and fact common to the Class include:

    a) Whether each of the Defendants intentionally or unlawfully impaired or impeded competition in the Relevant Markets;

b)     Whether each of the Defendants has monopoly and/or market power in each of the Relevant Markets;

c)     Whether each of the Defendants willfully maintained or enhanced their monopoly and/or market power in the Relevant Markets associated with Syngenta AIs;

d)     What effect each of the Defendants' conduct had on prices for crop protection products containing Relevant AIs;

e)     Whether each of the Defendants' conduct caused antitrust injury to the business or property of Plaintiffs and members of the Class in the nature of overcharges; and

f)     What the proper measure of damages is.

185.     The Class is readily identifiable and is one for which records should exist.

186.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that might arise in management of this class action.

187.     Plaintiffs know of no difficulty to be encountered in maintenance of this action as a class action.

## VII.     CLAIMS FOR RELIEF

### A.     VIOLATIONS OF FEDERAL ANTITRUST LAWS

## FIRST CLAIM FOR RELIEF
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT
## 15 U.S.C. § 1
## (FOR DECLARATORY AND EQUITABLE RELIEF)

188.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

189.    The relevant markets are the Relevant Markets defined above, and the relevant geographic market is the United States. Syngenta has had and continues to have monopoly power in the Relevant Markets associated with each of the Syngenta AIs. Corteva has had and continues to have monopoly power in the Relevant Markets associated with rimsulfuron and oxamyl. Corteva has had and continues to have market power in the Relevant Markets associated with acetochlor.

190.    Syngenta and Corteva each entered into loyalty agreements with distributors that provided for exclusionary payments designed to block generic competitors from competing in the Relevant Markets and keep prices for their crop protection products artificially high.

191.    The agreements between Syngenta and Corteva and their distributors had substantial anticompetitive effects. The agreements effectively excluded generic manufacturers from competing for a substantial portion of transactions in the Relevant Markets.

192.    The agreements between Syngenta and Corteva and distributors raised prices for crop protection products containing the Relevant AIs above the competitive level and otherwise injured competition without providing any offsetting procompetitive benefits to farmers.

193.    Syngenta's and Corteva's exclusionary and anticompetitive acts have injured and will continue to injure competition in each of the Relevant Markets.

194.    Syngenta's and Corteva's exclusionary and anticompetitive acts affect interstate commerce and injure competition nationwide.

195. Syngenta's and Corteva's conduct have caused Plaintiffs and those similarly situated to suffer damages in the form of injuries to their business or property, and Plaintiffs and all others similarly situated will continue to suffer such damages if the Defendants do not cease their anticompetitive conduct.

196. Plaintiffs and all others similarly situated have been injured in their business or property by reason of Syngenta's and/or Corteva's violation of section 1 of the Sherman Act within the meaning of section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

197. Plaintiffs and all others similarly situated are threatened with future injury to their business and property by reason of Syngenta's and Corteva's continuing violation of section 1 of the Sherman Act within the meaning of section 16 of the Clayton Antitrust Act, 15 U.S.C § 26.

198. Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a), Plaintiffs and the Class seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described in the preceding paragraphs violates section 1 of the Sherman Act.

199. Plaintiffs and members of the Class seek and are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT**
**15 U.S.C. § 1**
**(FOR DECLARATORY AND EQUITABLE RELIEF)**

200. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

201. Syngenta and Corteva have willfully and intentionally maintained, enhanced, and abused their monopoly and/or market power in each of the Relevant Markets through exclusionary loyalty agreements with distributors. The purpose of Syngenta's and Corteva's

44

conduct is to impede competition and provide each Defendant with an unlawful competitive advantage rather than competing on the merits through lower prices or higher quality products.

202.    By suppressing competition and maintaining and enhancing their monopoly and/or market power, Syngenta and Corteva were and are able to artificially inflate prices of crop protection products containing each Relevant AI above levels that they would have obtained in a world in which each Defendant did not engage in the anticompetitive conduct alleged herein.

203.    There are no procompetitive justifications for Syngenta's and Corteva's conduct, and even if there were, there are less restrictive means to achieve any procompetitive benefits.

204.    Syngenta's and Corteva's exclusionary conduct has foreclosed a substantial share of the Relevant Markets to competition from generic manufacturers.

205.    Through the anticompetitive and exclusionary practices described above, Syngenta and Corteva have willfully and unlawfully maintained and enhanced their monopoly and/or market power in the Relevant Markets in violation of section 2 of the Sherman Act.

206.    Syngenta's and Corteva's exclusionary and anticompetitive acts have injured and will continue to injure competition in the Relevant Markets.

207.    Syngenta's and Corteva's exclusionary and anticompetitive acts affect interstate commerce and injure competition nationwide.

208.    As a direct and proximate result of Syngenta's and Corteva's violation of section 2 of the Sherman Act, Plaintiffs and members of the Class have been injured in their businesses and property in the form of overcharges, and Plaintiffs and all other Class members will continue to suffer such injures if Syngenta and Corteva do not cease their anticompetitive conduct. These injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Syngenta's and Corteva's conduct unlawful.

45

209.    As a direct and proximate result of Syngenta's and Corteva's violation of section 2 of the Sherman Act, Plaintiffs and members of the Class have suffered injury and damages in the form of paying artificially inflated prices for crop protection products purchased indirectly during the Class Period.

210.    Plaintiffs and members of the Class are threatened with future injury to their business and property by reason of Syngenta's and Corteva's continuing violation of section 2 of the Sherman Act within the meaning of section 16 of the Clayton Act, 15 U.S.C. § 26.

211.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a), Plaintiffs and the Class seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described in the preceding paragraphs violates section 2 of the Sherman Act.

212.    Plaintiffs and members of the Class seek and are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF SECTION 3 OF THE CLAYTON ACT**
**(FOR DECLARATORY AND EQUITABLE RELIEF)**

213.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

214.    Syngenta and Corteva have provided exclusionary payments to distributors and retailers, in the form of rebates for the sale of crop protection products, that are conditioned on the recipients not using or dealing in the goods of generic manufacturers of crop protection products.

215.    Syngenta's and Corteva's anticompetitive and exclusionary conduct have substantially lessened competition and tends to create monopolies in each of the Relevant Markets.

216.    Syngenta's and Corteva's exclusionary conduct has foreclosed a substantial share of the Relevant Markets to competition from generic manufacturers.

217.    Plaintiffs and all others similarly situated are threatened with future injury to their business and property by reason of Syngenta's and Corteva's continuing violation of section 3 of the Clayton Act within the meaning of section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

218.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a), Plaintiffs and the Class seek a declaratory judgment that Defendants' conduct in seeking to prevent competition as described in the preceding paragraphs violates section 3 of the Clayton Act.

219.    Plaintiffs and members of the Class seek and are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## B.    VIOLATIONS OF STATE ANTITRUST LAWS

220.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

221.    The following Fourth through Twenty-Ninth Claims for Relief are pleaded under the antitrust laws of each State or jurisdiction identified below, on behalf of Plaintiffs and members of the Class.

222.    Although each individual count relies upon state law, the essential elements of each state antitrust claim are the same. The above-alleged conduct, which violates the federal Sherman Antitrust Act will, if proven, establish a claim under each of the state laws cited below.

### FOURTH CLAIM FOR RELIEF
### VIOLATION OF ARIZONA'S UNIFORM STATE ANTITRUST ACT
### ARIZ. REV. STAT. § 44-1401, *ET SEQ.*

223.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

224.     By reason of the conduct alleged herein, Defendant has violated Arizona Rev. Stat. § 44-1401, *et seq.*

225.     Under Arizona law, indirect purchasers have standing to maintain an action under the Antitrust Act based on the facts alleged in this Complaint. *Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 11-20 (2003).

226.     Under Arizona law, "[t]he establishment, maintenance or use of a monopoly or an attempt to establish a monopoly of trade or commerce, any part of which is within this state, by any person for the purpose of excluding competition or controlling, fixing, or maintaining prices is unlawful." ARIZ. REV. STAT. § 44-1403.

227.     Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within Arizona.

228.     Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Relevant Markets.

229.     Defendants' violations of Arizona law were flagrant.

230.     Defendants' unlawful conduct substantially affected Arizona's trade and commerce.

231.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property and are threatened with further injury.

232. By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief available under ARIZ. REV. STAT. ANN. 44-1401, *et seq.*

233. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Arizona Attorney General in accordance with ARIZ. REV. STAT. ANN. § 44-1415. Plaintiffs will file proof of such service with the Court.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT**
**CAL. BUS. & PROF. CODE § 16700, *ET SEQ.***

234. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

235. The California Business & Professions Code generally governs conduct of corporate entities. The Cartwright Act, CAL. BUS. & PROF. CODE §§ 16700-16770, governs antitrust violations in California.

236. California policy is that "vigorous representation and protection of consumer interests are essential to the fair and efficient functioning of a free enterprise market economy," including by fostering competition in the marketplace. CAL. BUS. & PROF. CODE § 301.

237. Under the Cartwright Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. CAL. BUS. & PROF. CODE § 16750(a).

238. A trust in California is any combination of capital, skills or acts by two or more persons intended for various purposes, including but not limited to creating or carrying out restrictions in trade or commerce, limiting or reducing the production or increasing the price of any commodity, or preventing competition in the market for a commodity. CAL. BUS. & PROF. CODE § 16720. Every trust in California is unlawful except as provided by the Code. *Id.* at § 16726.

49

239. Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade of commerce in the Relevant Markets, a substantial part of which occurred within California.

240. Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within California, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Relevant Markets.

241. Defendants enacted a combination of capital, skill or acts for the purpose of creating and carrying out restrictions in trade or commerce, in violation of CAL. BUS. & PROF. CODE § 16700, *et seq.*

242. Plaintiffs and/or other members of the Class purchased crop protection products within the State of California during the Class Period. But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

243. Plaintiffs and members of the Class were injured in their business or property with respect to purchases of crop protection products containing the Relevant AIs in California and are entitled to all forms of relief, including recovery of treble damages, interest, and injunctive relief, plus reasonable attorneys' fees and costs.

**SIXTH CLAIM FOR RELIEF**
**VIOLATION OF DISTRICT OF COLUMBIA ANTITRUST ACT**
**D.C. CODE § 28-4501, *ET SEQ*.**

244. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

245. The policy of the District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District

50

of Columbia by prohibiting restraints of trade and monopolistic practices." D.C. CODE § 28-4501.

246.    Plaintiffs and members of the Class purchased crop protection products containing the Relevant AIs within the District of Columbia during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

247.    Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the D.C. Code based on the facts alleged in this Complaint, because "[a]ny indirect purchaser in the chain of manufacture, production or distribution of goods or services . . . shall be deemed to be injured within the meaning of this chapter." D.C. CODE § 28-4509(a).

248.    Each Defendant contracted, combined, or conspired to act in restraint of trade within the District of Columbia, and monopolized or attempted to monopolize the Relevant Markets within the District of Columbia, in violation of D.C. CODE § 28-4501, *et seq.*

249.    Plaintiffs and members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in the District of Columbia and are entitled to all forms of relief, including actual damages, treble damages, as well as interest and reasonable attorneys' fees and costs.

## SEVENTH CLAIM FOR RELIEF
## VIOLATION OF ILLINOIS ANTITRUST ACT
## 740 ILL. COMP. STAT. ANN. 10/3(1), *ET SEQ.*

250.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

251.    The Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*, aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting

51

restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade . . . ." 740 ILL. COMP. STAT. ANN. 10/2.

252. Plaintiffs and members of the Class purchased crop protection products containing the Relevant AIs within the State of Illinois during the Class Period. But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

253. Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this complaint. 740 ILL. COMP. STAT. ANN.10/7(2).

254. Each Defendant entered into contracts or engaged in a combination or conspiracy for the purpose of fixing, controlling, or maintaining prices for crop protection products containing the Relevant AIs sold within the State of Illinois.

255. Each Defendant further unreasonably restrained trade or commerce and established, maintained, or attempted to acquire monopoly power over the Relevant Markets in Illinois for the purpose of excluding competition in violation of 740 ILL. COMP. STAT. ANN. 10/1, *et seq.*

256. Plaintiffs and members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Illinois and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees and costs.

**EIGHTH CLAIM FOR RELIEF**
**VIOLATION OF IOWA COMPETITION LAW**
**IOWA CODE § 553.1, *ET SEQ.***

257. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

258.     The Iowa Competition Law aims to "prohibit[] restraints of economic activity and monopolistic practices." IOWA CODE § 553.2.

259.     Under Iowa law, indirect purchasers have standing to maintain an action under the Iowa Competition Law based on the facts alleged in this Complaint. *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 449-51 (Iowa 2002).

260.     Members of the Class purchased crop protection products containing the Relevant AIs within the State of Iowa during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

261.     Each Defendant contracted, combined, or conspired to restrain or monopolize trade in the Relevant Markets and attempted to establish or did in fact establish a monopoly for the purpose of excluding competition or controlling, fixing, or maintaining prices for crop protection products containing the Relevant AIs in violation of Iowa Code § 553.1, *et seq.*

262.     Plaintiffs and members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Iowa, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

**NINTH CLAIM FOR RELIEF
VIOLATION OF KANSAS RESTRAINT OF TRADE ACT
KAN. STAT. ANN. § 50-101, *ET SEQ.***

263.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

264.     The Kansas Restraint of Trade Act aims to prohibit practices which, *inter alia*, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state . . . ." KAN. STAT. ANN. § 50-112.

265.     Members of the Class purchased crop protection products containing the Relevant AIs within the State of Kansas during the Class Period.

266.     But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

267.     Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. KAN. STAT. ANN. § 50-161(b).

268.     Each Defendant combined capital, skills, or acts for the purposes of creating restrictions in trade or commerce of crop protection products containing the Relevant AIs, increasing the price of crop protection products containing the Relevant AIs, or preventing competition in the sale of crop protection products containing the Relevant AIs in a manner that established the price of crop protection products containing the Relevant AIs and precluded free and unrestricted competition in the sale of crop protection products containing the Relevant AIs, in violation of KAN. STAT. ANN. § 50-101, *et seq.*

269.     Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Kansas and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

## TENTH CLAIM FOR RELIEF
## VIOLATION OF MAINE'S ANTITRUST STATUTE
## ME. REV. STAT. ANN. TIT. 10 § 1101, *ET SEQ.*

270.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

271.     Part 3 of Title 10 of the Maine Revised Statutes generally governs regulation of trade in Maine. Chapter 201 thereof governs monopolies and profiteering, generally prohibiting

contracts in restraint of trade and conspiracies to monopolize trade. *See* ME. REV. STAT. ANN. tit. 10, §§ 1101-02.

272.     Members of the Class purchased crop protection products containing the Relevant AIs within the State of Maine during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

273.     Under Maine law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. ME. REV. STAT. ANN. tit. 10, § 1104(1).

274.     Each Defendant contracted, combined, or conspired in restraint of trade or commerce of crop protection products containing the Relevant AIs within the intrastate commerce of Maine, and monopolized or attempted to monopolize the trade or commerce of crop protection products containing the Relevant AIs within the intrastate commerce of Maine, in violation of ME. REV. STAT. ANN. tit. 10, § 1101, *et seq.*

275.     Plaintiffs and members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Maine and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

**ELEVENTH CLAIM FOR RELIEF**
**VIOLATION OF MARYLAND'S ANTITRUST STATUTE**
**MD. CODE ANN. § 11-204(A), *ET SEQ.***

276.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

277.     Maryland's antitrust statute makes it unlawful to, *inter alia*, "[m]onopolize, attempt to monopolize, or combine or conspire with one or more other persons to monopolize any part of the trade or commerce within the State, for the purpose of excluding competition or of controlling, fixing, or maintaining prices in trade or commerce." MD. CODE ANN. § 11-204(a)(2).

278.     The purpose of Maryland's antitrust statute is "to complement the body of federal law governing restraints of trade, unfair competition, and unfair, deceptive, and fraudulent acts or practices." MD. CODE ANN. § 11-202(a)(1).

279.     Under Maryland law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. MD. CODE. ANN. § 11-209(b)(2)(i).

280.     Each Defendant contracted, combined, or conspired in restraint of trade or commerce of crop protection products containing the Relevant AIs within the intrastate commerce of Maryland, and monopolized or attempted to monopolize the trade or commerce of crop protection products containing the Relevant AIs within the intrastate commerce of Maryland, in violation of MD. CODE. ANN. § 204(a)(2), *et seq.*

281.     Under Maryland's antitrust statute, a plaintiff who establishes a violation is entitled to recover three times the amount of actual damages resulting from the violation, along with costs and reasonable attorneys' fees. MD. CODE. ANN. § 209(b)(4).

282.     Plaintiffs and members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Maryland and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' and experts' fees and costs.

## TWELFTH CLAIM FOR RELIEF
## VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT
## MICH. COMP. LAWS § 445.771, *ET SEQ.*

283.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

284.     The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . to prohibit monopolies and attempts to

56

monopolize trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984 (MICH. COMP. LAWS § 445.771, *et seq.*).

285.     Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Michigan during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

286.     Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. MICH. COMP. LAWS § 445.778(2).

287.     Defendants contracted, combined, or conspired to restrain or monopolize trade or commerce in the Relevant Markets and established, maintained, or used, or attempted to establish, maintain, or use, a monopoly of trade or commerce in violation of MICH. COMP. LAWS § 445.773.

288.     Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Michigan and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

## THIRTEENTH CLAIM FOR RELIEF
## VIOLATION OF THE MINNESOTA ANTITRUST LAW
## MINN. STAT. §§ 325D.49, *ET SEQ.* & 325D.57, *ET SEQ.*

289.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

290.     The Minnesota Antitrust Law of 1971 prohibits "any contract, combination or conspiracy when any part thereof was created, formed, or entered into in [Minnesota]; and any contract, combination or conspiracy, wherever created, formed or entered into; any establishment,

57

maintenance or use of monopoly power; and any attempt to establish, maintain or use monopoly power, whenever any of the forgoing affects the trade or commerce of [Minnesota]." MINN. STAT. § 325D.54.

291. Members of the Class purchased crop protection products containing the Relevant AIs within the State of Minnesota during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

292. Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. MINN. STAT. § 325D.57.

293. Defendants contracted, combined, or conspired in unreasonable restraint of trade or commerce in the Relevant Markets within the intrastate commerce of and outside of Minnesota, and established, maintained, used, or attempted to establish, maintain, or use monopoly power over the trade or commerce in the Relevant Markets, for the purpose of affecting competition or controlling, fixing, or maintaining prices within the intrastate commerce of and outside of Minnesota, in violation of MINN. STAT. § 325D.49, *et seq.*

294. Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs and are entitled to all forms of relief, including actual damages, treble damages, costs and disbursements, reasonable attorneys' fees, and injunctive relief necessary to prevent and restrain violations hereof.

295. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Minnesota Attorney General in accordance with Minn. Stat. § 325D.63.

## FOURTEENTH CLAIM FOR RELIEF
## VIOLATION OF THE MISSISSIPPI ANTITRUST STATUTE
## MISS. CODE ANN. § 75-21-1, *ET SEQ.*

296.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

297.     Title 75 of the Mississippi Code regulates trade, commerce, and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. MISS. CODE ANN. § 75-21-39.

298.     "A trust or combine is a combination, contract, understanding or agreement, express or implied . . . when inimical to the public welfare" and with the effect of, *inter alia*, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. MISS. CODE ANN. § 75-21-1.

299.     Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within Mississippi.

300.     Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Mississippi, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Relevant Markets.

301.     Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Mississippi during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

59

302.     Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. MISS. CODE ANN. § 75-21-9.

303.     Each Defendant combined, contracted, understood, and agreed in a manner inimical to public welfare, with the effect of restraining trade, increasing the price of crop protection products containing the Relevant AIs, and hindering competition in the sale of crop protection products containing the Relevant AIs, in violation of MISS. CODE ANN. § 75-21-1, *et seq.*

304.     Each Defendant monopolized or attempted to monopolize the production, control, or sale of crop protection products containing the Relevant AIs, in violation of MISS. CODE ANN. § 75-21-3, *et seq.*

305.     Crop protection products containing the Relevant AIs are sold indirectly via distributors and retailers throughout the State of Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

306.     Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Mississippi and are entitled to all forms of relief, including actual damages and a penalty of $500 per instance of injury.

### FIFTEENTH CLAIM FOR RELIEF
### VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT
### MO. ANN. STAT. § 407.010, *ET SEQ.*

307.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

308.     Chapter 407 of the Missouri Merchandising Practices Act (the "MMPA") generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

60

309. Plaintiffs and members of the Class purchased crop protection products containing the Relevant AIs within the State of Missouri during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

310. Under Missouri law, indirect purchasers have standing to maintain an action under the MMPA based on the facts alleged in this Complaint. *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 669 (Mo. 2007).

311. Each Defendant contracted, combined, or conspired in restraint of trade or commerce of crop protection products containing the Relevant AIs within the intrastate commerce of Missouri and monopolized or attempted to monopolize the market for crop protection products containing the Relevant AIs within the intrastate commerce of Missouri by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets, and otherwise control trade, in violation of MO. STAT. § 407.010, *et seq*.

312. Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Missouri and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

### SIXTEENTH CLAIM FOR RELIEF
### VIOLATION OF THE NEBRASKA JUNKIN ACT
### NEB. REV. STAT. § 59-801, *ET SEQ*.

313. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

314. Chapter 59 of the Nebraska Revised Statutes generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade and monopolization.

315. Members of the Class purchased crop protection products containing the Relevant AIs within the State of Nebraska during the Class Period. But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

316. Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. NEB. REV. STAT. § 59-821.

317. Each Defendant contracted, combined, or conspired in restraint of trade or commerce of crop protection products containing the Relevant AIs within the intrastate commerce of Nebraska, and monopolized or attempted to monopolize the Relevant Markets within the intrastate commerce of Nebraska by possessing monopoly power in the market and willfully maintaining that power through agreements to fix prices, allocate markets, and otherwise control trade, in violation of NEB. REV. STAT. § 59-801, *et seq.*

318. Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Nebraska and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

## SEVENTEENTH CLAIM FOR RELIEF
## VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT
## NEV. REV. STAT. § 598A.010, *ET SEQ.*

319. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

320.     The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities and services is necessary to the economic well-being of the citizens of the State of Nevada." NEV. REV. STAT. ANN. § 598A.030(1).

321.     The policy of NUTPA is to "[p]rohibit acts in restraint of trade or commerce," "[p]reserve and protect the free, open and competitive market," and "[p]enalize all persons engaged in [] anticompetitive practices." NEV. REV. STAT. ANN. § 598A.030(2). Such acts include, *inter alia*, price fixing, division of markets, allocation of customers, and monopolization of trade. *See* NEV. REV. STAT. § 598A.060.

322.     Members of the Class purchased crop protection products containing the Relevant AIs within the State of Nevada during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

323.     Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. NEV. REV. STAT. ANN. § 598A.210(2).

324.     Defendants monopolized or attempted to monopolize trade or commerce of crop protection products containing the Relevant AIs within the intrastate commerce of Nevada, constituting a contract, combination, or conspiracy in restraint of trade in violation of NEV. REV. STAT. ANN. § 598A.010, *et seq*.

325.     Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Nevada in that at least thousands of sales of crop protection products containing the Relevant AIs took place in Nevada, purchased by Nevada farmers at supra-competitive prices caused by Defendants' conduct.

326.     Accordingly, Plaintiffs and members of the Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

327.     In accordance with the requirements of § 598A.210(3), Plaintiffs mailed notice of this action to the Nevada Attorney General.

**EIGHTEENTH CLAIM FOR RELIEF**
**VIOLATION OF NEW HAMPSHIRE'S ANTITRUST STATUTE**
**N.H. REV. STAT. ANN. TIT. XXXI, § 356, *ET SEQ.***

328.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

329.     Title XXXI of the New Hampshire Statutes generally governs trade and commerce.

330.     Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. *See* N.H. REV. STAT. ANN. tit. XXXI, §§ 356:2, 3.

331.     Members of the Class purchased crop protection products containing the Relevant AIs within the State of New Hampshire during the Class Period. But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

332.     Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. REV. STAT. ANN. §356:11(II).

333.     Defendants established, maintained, or used monopoly power, or attempted to, constituting a contract, combination, or conspiracy in restraint of trade in violation of N.H. REV. STAT. § 356:1, *et seq*.

334.     Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in New Hampshire and are

64

entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

## NINETEENTH CLAIM FOR RELIEF
## VIOLATION OF THE NEW MEXICO ANTITRUST ACT
## N.M. STAT. ANN. § 57-1-1, *ET SEQ.*

335.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

336.    The New Mexico Antitrust Act aims to "prohibit[] restraints of trade and monopolistic practices." N.M. STAT. ANN. § 57-1-15.

337.    Members of the Class purchased crop protection products containing the Relevant AIs within the State of New Mexico during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower in an amount to be determined at trial.

338.    Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.M. STAT. ANN. § 57-1-3(A).

339.    Each Defendant contracted, agreed, combined, or conspired in restraint of, and monopolized or attempted to monopolize, trade for crop protection products containing the Relevant AIs within the intrastate commerce of New Mexico, in violation of N.M. STAT. ANN. § 57-1-1 and 57-1-2, *et seq*.

340.    Plaintiffs and other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in New Mexico and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

## TWENTIETH CLAIM FOR RELIEF
## VIOLATION OF SECTION 340 OF THE NEW YORK GENERAL BUSINESS LAW
## N.Y. GEN. BUS. LAW § 340, *ET SEQ.*

341.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

342.     Section 340 of Article 22 of the New York General Business Law prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade, or commerce in New York. *See* N.Y. GEN. BUS. LAW § 340(1).

343.     Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of New York during the Class Period. But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

344.     Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.Y. GEN. BUS. LAW § 340(6).

345.     Each Defendant established or maintained a monopoly within the intrastate commerce of New York for the trade or commerce of crop protection products containing the Relevant AIs and restrained competition in the free exercise of the conduct of the business of crop protection products containing the Relevant AIs within the intrastate commerce of New York, in violation of N.Y. GEN. BUS. LAW § 340, *et seq*.

346.     Plaintiffs and/or other members of the class were injured with respect to purchases of crop protection products containing the Relevant AIs in New York and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees and all relief available under N.Y. GEN. BUS. LAW § 349, *et seq*.

66

347. Pursuant to New York General Business Law § 340(5), counsel for Plaintiffs has sent letters by certified mail, return receipt requested, to the Attorney General of New York, informing the Attorney General of the existence of this Class Action Complaint, identifying the relevant state antitrust provisions, and enclosing a copy of the original complaints filed by Plaintiffs.

**TWENTY-FIRST CLAIM FOR RELIEF**
**VIOLATION OF THE NORTH CAROLINA GENERAL STATUTES**
**N.C. GEN. STAT. § 75-1, *ET SEQ*.**

348. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

349. Chapter 75 of the North Carolina Statutes generally governs unlawful business practices, including antitrust violations such as restraints of trade and monopolization.

350. Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

351. Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within North Carolina.

352. Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within North Carolina.

353. Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

354. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

355. By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-1, *et seq.*

### TWENTY-SECOND CLAIM FOR RELIEF
### VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT
### N.D. CENT. CODE § 51-08.1-01, *ET SEQ.*

356. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

357. The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. *See* N.D. CENT. CODE § 51-08.1-01, *et seq.*

358. Members of the Class purchased crop protection products containing the Relevant AIs within the State of North Dakota during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

359. Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. CENT. CODE § 51-08.1-08.

360. Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within North Dakota.

361. Each Defendant established, maintained, or used a monopoly, or attempted to do so, a substantial part of which occurred within North Dakota, for the purposes of excluding

competition or controlling, fixing, or maintaining prices for crop protection products containing the Relevant AIs, in violation of N.D. CENT. CODE § 51-08.1-02, 03.

362. Defendants' violations of North Dakota law were flagrant.

363. Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

364. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class were injured with respect to purchases in North Dakota and are threatened with further injury, and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief available under N.D. CENT. CODE § 51-08.1-01, *et seq.*

## TWENTY-THIRD CLAIM FOR RELIEF
## VIOLATION OF THE OREGON ANTITRUST LAW
## OR. REV. STAT. § 646.705, *ET SEQ.*

365. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

366. Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 880 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." OR. REV. STAT. § 646.715(1).

367. Members of the Class purchased crop protection products containing the Relevant AIs within the State of Oregon during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

69

368.     Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. OR. REV. STAT. § 646.780(1)(a).

369.     Each Defendant contracted, combined, or conspired in restraint of trade or commerce of crop protection products containing the Relevant AIs, and monopolized or attempted to monopolize the trade or commerce of crop protection products containing the Relevant AIs, in violation of OR. REV. STAT. § 646.705, *et seq*.

370.     Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

**TWENTY-FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE RHODE ISLAND ANTITRUST ACT**
**6 R.I. GEN. LAWS § 6-36-1, *ET SEQ*.**

371.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

372.     The Rhode Island Antitrust Act aims "[t]o promote the unhampered growth of commerce and industry throughout [Rhode Island] by prohibiting unreasonable restraints of trade and monopolistic practices" that hamper, prevent or decrease competition. 6 R.I. GEN. LAWS § 6-36-2(a)(2).

373.     Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Rhode Island during the Class Period. But for

70

Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

374.    Under the Rhode Island Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. GEN. LAWS § 6-36-11(a).

375.    Each Defendant contracted, combined, and conspired in restraint of trade crop protection products containing the Relevant AIs within the intrastate commerce of Rhode Island, and established, maintained, or used, or attempted to establish, maintain, or use, a monopoly in the trade of crop protection products containing the Relevant AIs for the purpose of excluding competition or controlling, fixing, or maintaining prices within the intrastate commerce of Rhode Island, in violation of R.I. GEN. LAWS § 6-36-1, *et seq*.

376.    Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products in Rhode Island and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

377.    In conjunction with the filing of this Complaint, Plaintiffs have mailed a copy of this Complaint to the Rhode Island Attorney General in accordance with R.I. Gen. Laws § 6-36-21. Plaintiffs will file proof of such service with the Court.

**TWENTY-FIFTH CLAIM FOR RELIEF**
**VIOLATION OF THE SOUTH DAKOTA ANTITRUST STATUTE**
**S.D. CODIFIED LAWS § 37-1-3.1, *ET SEQ*.**

378.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

379.    Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies, and discriminatory trade practices. S.D. CODIFIED LAWS §§ 37-1-3.1, 3.2.

71

380.     Members of the Class purchased crop protection products containing the Relevant AIs within the State of South Dakota during the Class Period. But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

381.     Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. *See* S.D. CODIFIED LAWS § 37-1-33.

382.     Each Defendant contracted, combined, or conspired in restraint of trade or commerce of crop protection products containing the Relevant AIs within the intrastate commerce of South Dakota, and monopolized or attempted to monopolize trade or commerce of crop protection products containing the Relevant AIs within the intrastate commerce of South Dakota, in violation of S.D. CODIFIED LAWS § 37-1, *et seq.*

383.     Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in South Dakota and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

## TWENTY-SIXTH CLAIM FOR RELIEF
## VIOLATION OF THE TENNESSEE TRADE PRACTICES ACT
## TENN. CODE § 47-25-101, *ET SEQ.*

384.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

385.     The Tennessee Trade Practices Act generally governs commerce and trade in Tennessee, and it prohibits, *inter alia*, all arrangements, contracts, agreements, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in goods in Tennessee. All such arrangements, contracts, agreements, or

72

combinations between persons or corporations designed, or which tend, to increase the prices of any such goods, are against public policy, unlawful, and void. *See* TENN. CODE, § 47-25-101.

386.    Under Tennessee law, indirect purchasers have standing under the Tennessee Trade Practice Acts to maintain an action based on the facts alleged in this Complaint. *See Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 520 (Tenn. 2005).

387.    Defendants competed unfairly and colluded by meeting to fix prices, divide markets, and otherwise restrain trade as set forth herein, in violation of Tenn. Code, § 47-25-101, *et seq.*

388.    Each Defendant's conduct violated the Tennessee Trade Practice Act because it was an arrangement, contract, agreement, or combination to lessen full and free competition in goods in Tennessee, and because it tended to increase the prices of goods in Tennessee. Specifically, each Defendant's combination or conspiracy had the following effects: (1) price competition for crop protection products containing the Relevant AIs was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for crop protection products containing the Relevant AIs were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) members of the Class were deprived of free and open competition; and (4) members of the Class paid supracompetitive, artificially inflated prices for crop protection products containing the Relevant AIs.

389.    During the Class Period, each Defendant's illegal conduct had a substantial effect on Tennessee commerce as crop protection products containing the Relevant AIs were sold in Tennessee.

390.    Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Tennessee during the Class Period. But for

Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

391. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have been injured in their business and property and are threatened with further injury.

392. Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Tennessee and are entitled to all forms of relief available under the law, including return of the unlawful overcharges that they paid on their purchases, damages, equitable relief, and reasonable attorneys' fees.

## TWENTY-SEVENTH CLAIM FOR RELIEF
## VIOLATION OF THE UTAH ANTITRUST ACT
## UTAH CODE ANN. § 76-10-3101, *ET SEQ.*

393. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

394. The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce." UTAH CODE ANN. § 76-10-3102.

395. Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Utah during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

396. Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. UTAH CODE ANN. § 76-10-3109(1)(a).

397. Each Defendant contracted, combined, or conspired in restraint of trade or commerce of crop protection products containing the Relevant AIs and monopolized or attempted to monopolize trade or commerce of crop protection products containing the Relevant AIs, in violation of UTAH CODE ANN. § 76-10-3101, *et seq.*

398. Plaintiffs and/or other members of the Class who are either Utah residents or Utah citizens were injured with respect to purchases of crop protection products containing the Relevant AIs in Utah and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

399. In conjunction with the filing of this Complaint, Plaintiffs have served a copy of this Complaint on the Utah Attorney General in accordance with Utah Code Ann. § 76-10-3109(9).

## TWENTY-EIGHTH CLAIM FOR RELIEF
## VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT
## W. VA. CODE § 47-18-1, *ET SEQ.*

400. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

401. The violations of law set forth above also constitute violations of section 47-18-1 of the West Virginia Code.

402. During the Class Period, Defendants engaged in anticompetitive conduct alleged above, including a continuing contract, combination, or conspiracy in unreasonable restraint of trade and commerce within the intrastate commerce of West Virginia and the establishment or maintenance of a monopoly for the purpose of excluding competition, in violation of W. VA. CODE §§ 47-18-3; 47-18-4.

75

403. Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred in West Virginia.

404. Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within West Virginia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Relevant Markets.

405. Plaintiffs and/or other members of the Class purchased crop protection products within the State of West Virginia during the Class Period. But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

406. Under West Virginia law, indirect purchasers have standing to maintain an action under the West Virginia Antitrust Act based on the facts alleged in this Complaint. W. VA. CODE St. R. 142-9-2 ("Any person who is injured directly or indirectly by reason of a violation of the West Virginia Antitrust Act, W. Va. Code § 47-18-1, et seq., may bring an action for damages under W. Va. Code § 47-18-9.").

407. Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

408. As a direct and proximate result of each Defendant's unlawful conduct, Plaintiffs and other members of the Class have been injured in their business and property in that they paid more for crop protection products containing the Relevant AIs than they otherwise would have paid in the absence of Defendants' unlawful conduct.

409.    Members of the Class have standing to pursue their claims under, *inter alia*, W.V. Code § 47-18-9.

410.    As a result of Defendants' violation of section 47-18-3 of the West Virginia Antitrust Act, Plaintiffs and members of the Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to section 47-18-9 of the West Virginia Code.

## TWENTY-NINTH CLAIM FOR RELIEF
## VIOLATION OF THE WISCONSIN ANTITRUST ACT
## WIS. STAT. § 133.01, *ET SEQ.*

411.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

412.    Chapter 133 of the Wisconsin Statutes governs trusts and monopolies, with the intent "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory business practices which destroy or hamper competition." WIS. STAT. § 133.01.

413.    Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Wisconsin during the Class Period. But for Defendants' conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

414.    Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. *See* WIS. STAT. § 133.18(1)(a).

415.    Defendants contracted, combined, or conspired in restraint of trade or commerce of crop protection products containing the Relevant AIs and monopolized or attempted to monopolize the trade or commerce of crop protection products containing the Relevant AIs with

77

the intention of injuring or destroying competition therein, in violation of WIS. STAT. § 133.01, *et seq*.

416.    Plaintiffs and/or other members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of consumers in Wisconsin paying substantially higher prices for crop protection products containing the Relevant AIs in Wisconsin.

417.    Accordingly, Plaintiffs and members of the Class are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

418.    Each Defendant's anticompetitive activities have directly, foreseeably, and proximately caused injury to Plaintiffs and members of the Class in the United States. Their injuries consist of: (1) being denied the opportunity to purchase lower-priced crop protection products containing the Relevant AIs, and (2) paying higher prices for crop protection products containing the Relevant AIs than they would have in the absence of Defendants' conduct. These injuries are of the type that the laws of the above States were designed to prevent, and they flow from that which makes Defendants' conduct unlawful.

419.    Defendants are jointly and severally liable for all damages suffered by Plaintiffs and members of the Class.

## C.      VIOLATIONS OF STATE CONSUMER PROTECTION LAWS

420.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

421.    Each Defendant's above-described conduct constitutes unfair competition, unconscionable conduct, and deceptive acts and practices in violation of the state statutes set

forth below, which are sometimes referred to as "consumer protection" statutes. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, and/or unconscionable acts or practices, Plaintiffs and members of the Class paid higher prices for crop protection products containing the Relevant AIs than they should have.

422. The gravity of harm from Defendants' wrongful conduct significantly outweighs any conceivable utility from that conduct. Plaintiffs and Class members could not reasonably have avoided injury from Defendants' wrongful conduct.

423. There was and is a gross disparity between the price that Plaintiffs and members of the Class paid for crop protection products containing the Relevant AIs and the value they received.

424. The following Thirtieth through Forty-Fourth claims for relief are pleaded under the consumer protection or similar laws of each State or jurisdiction identified below, on behalf of Plaintiffs and the Class.

**THIRTIETH CLAIM FOR RELIEF**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW (THE "UCL")**
**CAL. BUS. & PROF. CODE § 17200, *ET SEQ.***

425. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

426. The violations of federal antitrust law set forth above also constitute violations of section 17200, *et seq.*, of the California Business and Professions Code.

427. Defendants have engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the UCL by engaging in the acts and practices specified above.

79

428. This claim is instituted pursuant to sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated the UCL.

429. Defendants' conduct as alleged herein violated the UCL. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of the UCL, including, but not limited to, the violations of section 16720, *et seq*., of California Business and Professions Code, set forth above.

430. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of section 16720, *et seq*., of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful, or fraudulent.

431. Plaintiffs and members of the Class are entitled to, *inter alia*, full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business acts or practices.

432. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future.

433. The unlawful and unfair business practices of each Defendant have caused and continue to cause members of the Class to pay supracompetitive and artificially inflated prices for crop protection products containing the Relevant AIs sold in the State of California. Plaintiffs and/or other members of the Class suffered injury in fact and lost money or property as a result of such unfair competition.

434.     As alleged in this Complaint, Defendants have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and the members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to California Business and Professions Code Sections 17203 and 17204.

**THIRTY-FIRST CLAIM FOR RELIEF**
**VIOLATION OF THE DISTRICT OF COLUMBIA**
**CONSUMER PROTECTION PROCEDURES ACT**
**D.C. CODE § 28-3901, *ET SEQ*.**

435.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

436.     By reason of the conduct alleged herein, Defendants have violated D.C. CODE § 28-3901, *et seq*.

437.     Defendants are "merchants" within the meaning of D.C. CODE § 28- 3901(a)(3).

438.     Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within the District of Columbia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Relevant Markets.

439.     Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the District of Columbia.

440.     Defendants' unlawful conduct substantially affected the District of Columbia's trade and commerce.

441. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property and are threatened with further injury.

442. By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief, including treble damages or $1500 per violation (whichever is greater) plus punitive damages, reasonable attorneys' fees and costs under D.C. CODE § 28-3901, *et seq*.

### THIRTY-SECOND CLAIM FOR RELIEF
### VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### FLA. STAT. § 501.201(2), *ET SEQ.*

443. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

444. The Florida Deceptive & Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. FLA. STAT. § 501.204(1).

445. The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.202(2).

446. A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

447. Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. *See* FLA. STAT. § 501.211(1) ("anyone aggrieved by a violation of this [statute] may bring an action . . .").

448.     Plaintiffs and/or other members of the Class purchased crop protection products containing the Relevant AIs within the State of Florida during the Class Period. But for each Defendant's conduct set forth herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

449.     Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within Florida.

450.     Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets for the purpose of excluding competition or controlling, fixing, or maintaining prices in Florida at a higher level than the competitive market level, beginning at least as early as the beginning of the Class Period and continuing through the date of this filing.

451.     Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

452.     Defendants' unlawful conduct substantially affected Florida's trade and commerce.

453.     As a direct and proximate cause of each Defendant's unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property by virtue of overcharges for crop protection products containing the Relevant AIs and are threatened with further injury.

454.     By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including injunctive relief pursuant to Fla. Stat. § 501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Fla. Stat. § 501.211.

## THIRTY-THIRD CLAIM FOR RELIEF
## VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT
## MASS. GEN. LAWS. CH. 93A § 1, *ET SEQ.*

455. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

456. By reason of the conduct alleged herein, including the violation of federal antitrust laws, Defendants have violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A § 2, *et seq*.

457. Plaintiffs and members of the Class purchased crop protection products containing the Relevant AIs within the Commonwealth of Massachusetts during the Class Period. But for Defendants' conduct set forth herein, the price paid would have been lower, in an amount to be determined at trial.

458. Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Massachusetts, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Relevant Markets.

459. Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the Commonwealth of Massachusetts.

460. Defendants' unlawful conduct substantially affected Massachusetts' trade and commerce.

461. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

462.     By reason of the foregoing, Plaintiffs and the Class are entitled to seek all forms of relief, including up to treble damages and reasonable attorneys' fees and costs under Massachusetts General Laws ch. 93A § 9.

463.     The demand letter requirement of section 9 of Massachusetts General Laws Annotated Chapter 93A does not apply as to Syngenta or Corteva because, upon information and belief, neither company has identified a place of business or assets within Massachusetts.

**THIRTY-FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES AND**
**CONSUMER PROTECTION ACT OF 1970,**
**MONT. CODE, §§ 30-14-103, *ET SEQ.*, AND §§ 30-14-201, *ET SEQ.***

464.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

465.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*, and 30-14-201, *et seq.*

466.     Defendants' unlawful conduct had the following effects: (1) price competition for crop protection products containing the Relevant AIs was restrained, suppressed, and eliminated throughout Montana; (2) prices for crop protection products containing the Relevant AIs were raised, fixed maintained, and stabilized at artificially high levels; (3) Plaintiffs and other members of the Class were deprived of free and open competition; and (4) Plaintiffs and other members of the Class paid supracompetitive, artificially inflated prices for crop protection products containing the Relevant AIs.

467.     During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers.

85

468.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, *et seq.*, and 30-14-201, *et seq.*, and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute.

**THIRTY-FIFTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT**
**NEB. REV. STAT. § 59-1602, *ET SEQ*.**

469.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

470.     By reason of the conduct alleged herein, Defendants have violated NEB. REV. STAT. § 59-1602, *et seq*.

471.     Under Nebraska law, indirect purchasers have standing to maintain an action under the Nebraska Consumer Protection Act based on the facts alleged in this Complaint. *See* NEB. REV. STAT. § 59-1609.

472.     Each Defendant has entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within Nebraska.

473.     Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Nebraska.

474.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nebraska.

86

475. Defendants' conduct had a direct or indirect impact upon Plaintiffs and members of the Class's ability to protect themselves.

476. Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

477. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

478. By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief available under NEB. REV. STAT. § 59-1614.

## THIRTY-SIXTH CLAIM FOR RELIEF
## VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT
## NEV. REV. STAT. § 598.0903, *ET SEQ.*

479. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

480. By reason of the conduct alleged herein, Defendants have violated NEV. REV. STAT. § 598.0903*, et seq*.

481. Defendants engaged in a deceptive trade practice with the intent to injure competitors and to substantially lessen competition.

482. Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within Nevada.

483. Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade of commerce in the Relevant Markets, a substantial part of which occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Relevant Markets.

484. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

485. Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

486. Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

487. Defendants' conduct was willful.

488. As a direct and proximate cause of Defendants' unlawful conduct, the members of the Class have been injured in their business or property and are threatened with further injury.

489. By reason of the foregoing, the Class is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under NEV. REV. STAT. § 598.0993.

### THIRTY-SEVENTH CLAIM FOR RELIEF
### VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT
### N.H. REV. STAT. ANN. TIT. XXXI, § 358-A:1, *ET SEQ.*

490. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

491. By reason of the conduct alleged herein, defendants have violated N.H. REV. STAT. tit. XXXI, § 358-A:1, *et seq.*

492. Under New Hampshire law, indirect purchasers have standing to maintain an action under the New Hampshire Consumer Protection Act based on the facts alleged in this Complaint. *See LaChance v. U.S. Smokeless Tobacco Co.*, 156 N.H. 88, 92-100 (2007).

493. Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within New Hampshire.

88

494.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within New Hampshire, for the purpose of excluding or limiting competition or controlling or maintaining prices.

495.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of New Hampshire.

496.    Defendants' conduct was willful and knowing.

497.    Defendants' conduct had a direct or indirect impact upon Plaintiffs' and other members of the Class's ability to protect themselves.

498.    Defendants' unlawful conduct substantially affected New Hampshire's trade and commerce.

499.    As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

500.    By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief available under New Hampshire Revised Statutes §§ 358-A:10 and 358-A:10-a.

**THIRTY-EIGHTH CLAIM FOR RELIEF**
**VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT**
**N.M. STAT. ANN. § 57-12-1,** *ET SEQ.*

501.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

502.    By reason of the conduct alleged herein, Defendants have violated N.M. STAT. § 57-12-3, *et seq.*

503. Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within New Mexico.

504. Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within New Mexico, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Relevant Markets.

505. Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of New Mexico.

506. Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

507. Each Defendant's conduct constituted "unconscionable trade practices" in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Class members and the price paid by them for crop protection products containing the Relevant AIs as set forth in N.M. STAT. § 57- 12-2E.

508. Defendants' conduct was willful.

509. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

510. By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief, including actual damages or up to $300 per violation, whichever is greater, plus reasonable attorney's fees under N.M. STAT. § 57-12-10.

## THIRTY-NINTH CLAIM FOR RELIEF
## VIOLATION OF THE NORTH CAROLINA UNFAIR AND
## DECEPTIVE TRADE PRACTICES ACT,
## N.C. GEN. STAT. § 75-1.1, *ET SEQ.*

511.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

512.     By reason of the conduct alleged herein, Defendants have violated N.C. Gen. Stat. § 75-1.1*, et seq*. Under North Carolina law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See Hyde v. Abbott Labs., Inc.*, 123 N.C. App. 572, 584 (1996).

513.     Each Defendant entered into a contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within North Carolina.

514.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

515.     Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

516.     Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

517.     Defendants' conduct constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

518.     As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

519.     By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including treble damages under N.C. GEN. STAT. § 75-16.

**FORTIETH CLAIM FOR RELIEF**
**VIOLATION OF THE NORTH DAKOTA UNLAWFUL SALES OR**
**ADVERTISING PRACTICES ACT**
**N.D. CENT. CODE § 51-10-01, *ET SEQ*.**

520.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

521.     By reason of the conduct alleged herein, Defendants have violated N.D. CENT. CODE § 51-10-01, *et seq*. Under North Dakota law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. *See* N.D. CENT. CODE § 51-10-09 ("[T]his chapter does not bar any claim for relief by any person against any person who has acquired any moneys or property by means of any practice declared to be unlawful in this chapter.").

522.     Each Defendant engaged in conduct in connection with the sale or advertisement of merchandise that was unconscionable and/or conduct that caused or was likely to cause substantial injury to persons which was not reasonable avoidable by the injured person.

523.     Each Defendant's unconscionable and/or injurious conduct was not outweighed by countervailing benefits to consumers or to competition.

524.     Defendants' conduct was committed knowingly.

525.     As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

526. By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including treble damages and costs, disbursements, and attorneys' fees under N.D. CENT. CODE § 51-10-09.

## FORTY-FIRST CLAIM FOR RELIEF
## VIOLATION OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT
## R.I. GEN. LAWS § 6-13.1-1, *ET SEQ.*

527. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

528. By reason of the conduct alleged herein, Defendants have violated R.I. GEN. LAWS § 6-13.1-1, *et seq.*

529. Defendants engaged in an unfair or deceptive act or practice with the intent to injure competitors and consumers through supra-competitive profits.

530. Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within Rhode Island.

531. Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Rhode Island, for the purpose of controlling, fixing, or maintaining prices in the Relevant Markets.

532. Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of Rhode Island.

533. Defendants' conduct amounted to an unfair or deceptive act or practice committed by a supplier in connection with a consumer transaction.

534. Defendants' unlawful conduct substantially affected Rhode Island's trade and commerce.

535. Defendants' conduct was willful.

536. Defendants' deception constitutes information necessary to Plaintiffs and members of the Class relating to the cost of crop protection products containing the Relevant AIs purchased.

537. As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and members of the Class have been injured in their business or property and are threatened with further injury.

538. By reason of the foregoing, Plaintiffs and members of the Class are entitled to seek all forms of relief, including actual damages or $200 per violation, whichever is greater, and injunctive relief and punitive damages under R.I. GEN. LAWS § 6-13.1-5.2.

**FORTY-SECOND CLAIM FOR RELIEF**
**VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT**
**S.C. CODE ANN. §§ 39-5-10, *ET SEQ*.**

539. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

540. By reason of the conduct alleged herein, Defendants have violated S.C. Code Ann. § 39-5-10, *et seq*.

541. Each Defendant has entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within South Carolina.

542. Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within South Carolina, for the purpose of excluding or limiting competition or controlling or maintaining prices.

543.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina.

544.    Defendants' conduct had a direct or indirect impact upon Plaintiffs' and members of the Class's ability to protect themselves.

545.    Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

546.    Each Defendant's unlawful conduct substantially harmed the public interest of the State of South Carolina, as at least thousands of members of the public purchase crop protection products containing the Relevant AIs.

**FORTY-THIRD CLAIM FOR RELIEF**
**VIOLATION OF THE UTAH CONSUMER SALES PRACTICES ACT**
**UTAH CODE ANN. §§ 13-11-1, *ET SEQ.***

547.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

548.    By reason of the conduct alleged herein, Defendants have violated Utah Code Ann. §§ 13-11-1, *et seq.*

549.    Defendants are a supplier within the meaning of UTAH CODE ANN. §§ 13-11-3.

550.    Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred in Utah.

551.    Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Utah, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Relevant Markets.

95

552.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Utah.

553.     Defendants' conduct and/or practices were unconscionable and were undertaken in connection with consumer transactions within the meaning of UTAH CODE ANN. §§ 13-11-3.

554.     Defendants knew or had reason to know that their conduct was unconscionable.

555.     Defendants' unlawful conduct substantially affected Utah's trade and commerce.

556.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of Class have been injured in their business or property and are threatened with further injury.

557.     By reason of the foregoing, Plaintiffs and the members of the Class are entitled to seek all forms of relief, including declaratory judgment, injunctive relief, and ancillary relief, pursuant to Utah Code Ann. §§ 13-11-19(5) and 13-11-20.

## FORTY-FOURTH CLAIM FOR RELIEF
## VIOLATION OF THE VERMONT CONSUMER FRAUD ACT
## VT. STAT. ANN. TIT. 9, CH. 63 §2451, *ET SEQ.*

558.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

559.     By reason of the conduct alleged herein, Defendants have violated VT. STAT. ANN. tit. 9, § 2451, *et seq.*

560.     Title 9 of the Vermont Statutes generally governs commerce and trade in Vermont. Chapter 63 thereof governs consumer protection and prohibits, *inter alia*, unfair methods of competition, unfair and deceptive acts and practices, and antitrust violations such as restraints of trade and monopolization. *See* VT. STAT ANN. tit. 9, § 2453(a).

561.     Members of the Class purchased crop protection products containing the Relevant AIs within the State of Vermont during the Class Period. But for Defendants' conduct set forth

96

herein, the price of crop protection products containing the Relevant AIs would have been lower, in an amount to be determined at trial.

562.     Under Vermont law, indirect purchasers have standing under the antitrust provisions of the Vermont Statutes to maintain an action based on the facts alleged in this complaint. VT. STAT. ANN. tit. 9, § 2465(b); *see also Elkins v. Microsoft Corp.*, 174 Vt. 328, 341 (2002).

563.     Defendants competed unfairly by restraining trade as set forth herein, in violation of VT. STAT. ANN. tit. 9, § 2453, *et seq*.

564.     Each Defendant entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Relevant Markets, a substantial part of which occurred within Vermont.

565.     Each Defendant established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Vermont, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Relevant Markets.

566.     Defendants' violations of Vermont law were flagrant.

567.     Defendants' conduct caused or was intended to cause unfair methods of competition within the State of Vermont.

568.     Defendants' unlawful conduct substantially affected Vermont's trade and commerce.

569.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Class have been injured in their business or property and are threatened with further injury.

570. Plaintiffs and members of the Class were injured with respect to purchases of crop protection products containing the Relevant AIs and are entitled to all forms of relief, including actual damages, treble damages, and reasonable attorneys' fees.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully ask the Court for a judgment that:

1. Certifies the Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) and directs that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, and declares Plaintiffs as representatives of the Class;

2. Appoints Plaintiffs and their attorneys as class representatives and class counsel, respectively;

3. Enters judgment against Defendants, and in favor of Plaintiffs and the Class, holding Defendants liable for the antitrust violations alleged;

4. Awards a declaratory judgment that Syngenta's and Corteva's conduct was done for illegal, anticompetitive purposes, was an unreasonable restraint of trade, and had anticompetitive effects on the Relevant Markets in violation of section 1 of the Sherman Act, section 2 of the Sherman Act, and section 3 of the Clayton Act;

5. Grants permanent injunctive relief:

   a. Enjoining Syngenta and Corteva from engaging in future anticompetitive conduct with the purpose or effect of foreclosing the Relevant Markets to competition from actual or potential rivals;

   b. Requiring Syngenta and Corteva to take affirmative steps to dissipate the continuing effects of their prior unlawful conduct;

6.     Awards Plaintiffs and the Class actual, double, treble, and exemplary damages as permitted and as sustained by reason of the antitrust violations alleged herein, plus interest in accordance with the law;

7.     Awards such equitable relief as is necessary to correct for the anticompetitive market effects caused by Syngenta's and Corteva's unlawful conduct, including disgorgement, restitution, and the creation of a constructive trust;

8.     Awards Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees provided by law;

9.     Directs such further relief as it may deem just and proper.

## IX.     DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

December 26, 2022

Respectfully submitted,

Daniel L. Brockett
Steig D. Olson
Sami H. Rashid
Anais Berland
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010-1601
Telephone: (212) 849-7000
Fax: (212) 849-7100
danbrockett@quinnemanuel.com
steigolson@quinnemanuel.com
samirashid@quinnemanuel.com
anaisberland@quinnemanuel.com

Jeremy D. Andersen
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
jeremyandersen@quinnemanuel.com

*Counsel for Plaintiffs*

Sarah Vogel
SARAH VOGEL LAW OFFICE
1203 N 2nd St
Bismarck, ND 58501
Telephone: 701 400 6210
sarahvogellaw@gmail.com

*Counsel for Plaintiffs*

*/s/ Jay Chaudhuri*

Jay Chaudhuri (N.C. Bar No. 27747)
COHEN MILSTEIN SELLERS & TOLL
PLLC
407 N. Person Street, Fifth Floor
Raleigh, N.C. 27601
Telephone: (919) 890-0560
Fax: (919) 890-0567
jchaudhuri@cohenmilstein.com

Michael B. Eisenkraft
Mikaela Pyatt
COHEN MILSTEIN SELLERS & TOLL
PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-0177
Fax: (212) 838-7745
meisenkraft@cohenmilstein.com
mpyatt@cohenmilstein.com

Daniel H. Silverman
Leonardo Chingcuanco
COHEN MILSTEIN SELLERS & TOLL
PLLC
1100 New York Avenue NW, 5th Floor
Washington, DC 20005
Telephone: (202) 408-4600
Fax: (202) 408-4699
dsilverman@cohenmilstein.com
lchingcuanco@cohenmilstein.com

Manuel J. Dominguez
COHEN MILSTEIN SELLERS & TOLL
PLLC
11780 U.S. Highway One, Suite N500
Palm Beach Gardens, FL 33408
Telephone: (561) 515-2604
Fax: (561) 515-1601
jdominguez@cohenmilstein.com

*Counsel for Plaintiffs*

M. Stephen Dampier
THE DAMPIER LAW FIRM, P.C.
11 N. Water Street, Suite 10290
Mobile, AL 36602
Telephone: (251) 929-0900
Fax: (888) 387-1930
stevedampier@dampierlaw.com

*Counsel for Plaintiffs*

101